902 A.2d 476

Mary Beth KUZNIK, Jim Ferlo, Sallie W. Bradley, Merle L. Kuznik, Clare Vaill, Timothy Krupar, William P. Kuznik, Jeffrey Hails, John W. Hetler, Charlene May Hetler, and Matthew Hetler, Appellees

v.

WESTMORELAND COUNTY BOARD OF COMMISSIONERS, Westmoreland County Board of Elections and Pedro A. Coréts, Secretary of the Commonwealth,

Appeal of Pedro A. Cortés.

Supreme Court of Pennsylvania.

Argued March 1, 2006.

Decided July 20, 2006.

96

Paul William O'Hanlon, Disability Law Project, for PA Protection and Advocacy, etc., amicus curiae.

Eugene A. Ferace, Robert Mark Gesalman, Office of County Sol., for Westmoreland County Bd. of Elections.

Mark Alan Aronchick, Shawn Alexander Weede, Hangley Aronchick Segal & Pudlin, P.C., Philadelphia; Albert H. Masland, Gregory Eugene Dunlap, PA Governor's Office of Gen. Counsel, for Pedro A. Cortés.

Charles Anthony Pascal, Jr., for Mary Beth Kuznik.

Before: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice NEWMAN.

In this case, we must determine whether the Commonwealth Court erred by finding that Westmoreland County and State election officials violated the Pennsylvania Constitution

and Pennsylvania Election Code [1] by agreeing to purchase electronic voting systems (EVS) [2] for use in the Westmoreland County General Primary on May 16, 2006 (Spring Primary Election), without first submitting the issue to a referendum vote before the electors in that County.

We must also decide whether a state referendum requirement, which led to the dual system of voting that the Commonwealth Court imposed, obstructs the goals of the federal Help America Vote Act (HAVA), 42 U.S.C. §§ 15301–15545. This Act requires the replacement of lever voting machines by EVS in the upcoming Spring Primary Election for federal office.

The Commonwealth Court held that the requirements of HAVA do not trump the referendum provisions of state law and, accordingly, granted a permanent injunction prohibiting Appellants from purchasing the EVS until a Westmoreland County voter referendum approves the change from lever machines to EVS.

Two intertwined reasons warrant our determination that the Commonwealth Court committed an error of law by enjoining the purchase of EVS. First, our Election Code sets forth a unitary system of voting, which is inconsistent with requiring voters to use two different machines for voting in the Spring Primary Election. Second, based on the facts of the instant situation, the state referendum requirement poses an obstacle to achieving one of the most compelling goals of HAVA, which is that the voting system "be accessible for individuals with disabilities, including nonvisual accessibility for the blind and

1. Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600–3553.

2. An "electronic voting system" (EVS) is "a system in which one or more voting devices are used to permit the registering or recording of votes and in which such votes are computed and tabulated by automatic tabulating equipment. The system shall provide for a permanent physical record of each vote cast." 25 P.S. § 3031.1. An EVS is an umbrella term for numerous different voting systems, one of which includes the Direct Recording Electronic (DRE) system that Westmoreland County intended to purchase for use at the Spring Primary Election. For purposes of consistency throughout this Opinion, we use the term EVS to indicate any of the HAVA-compliant electronic voting systems, including the DRE, that are available today.

visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters." 42 U.S.C. § 15481(a)(3)(A). Because of this, we find that the state referendum requirement is preempted.

We reverse the Order of the Commonwealth Court, vacate the injunction, and hold that in light of the requirement of HAVA to replace lever machines with EVS for voting in elections for federal office, the Secretary correctly determined that a referendum is not needed prior to purchasing the units for use at the Spring Primary Election, and those units must be used with respect to elections for both federal and local offices. Appellants are permitted to purchase the units for use at the Spring Primary Election without holding a referendum, with respect to elections for both federal and state and local offices.

## FACTS AND PROCEDURAL HISTORY

On January 2, 2006, Appellees, Mary Beth Kuznik, Jim Ferlo, Sallie W. Bradley, Merle L. Kuznik, Clair Vaill, Timothy Krupar, William P. Kuznik, Jeffrey Hails, John W. Hetler, Charlene May Hetler, and Matthew Hetler (collectively, the "Electors"),[3] filed an action for Declaratory Judgment and a Complaint in Equity in the Court of Common Pleas of Westmoreland County (trial court). They alleged that Appellants, the Westmoreland County Board of Commissioners ("Commissioners"), the Westmoreland County Board of Elections (the "Board of Elections" or "Election Board"), and Pedro A. Cortés, the Secretary of the Commonwealth (the "Secretary"), violated the Pennsylvania Constitution and the Election Code by agreeing to purchase an EVS without putting the issue to a vote before the voters of Westmoreland County. The

---

**3.** Mary Beth Kuznik is the Majority Inspector of Elections; Merle L. Kuznik is the Judge of Elections; and Clare Vaill is the Minority Inspector of Elections, all in Penn Township, Ward 4, Precinct 2. Jim Ferlo is a member of the Pennsylvania Senate representing the 38th Senatorial District, which includes parts of Westmoreland County. Sallie W. Bradley is a School Director in the Penn–Trafford School District.

Electors also filed a Motion for Preliminary Injunction. The Commissioners and the Board of Elections then filed a Motion to Transfer the case to Commonwealth Court, arguing that the Secretary was an indispensable party. The Secretary is the chief state election official as defined by HAVA and is responsible for its implementation in Pennsylvania. The Motion to Transfer to Commonwealth Court was granted.

The Electors requested the Commonwealth Court to declare that the Board of Elections was required to put the issue of purchasing a voting system to the electors of Westmoreland County and to declare that the Election Board's action to enter into a contract with Election Systems and Software, Inc. for the purchase of the voting system violates the Pennsylvania Constitution and Pennsylvania Election Code.

They also sought preliminary and permanent injunctive relief enjoining the Board of Elections from implementing the contract to purchase the voting system without submitting it first to a referendum vote.

The Board of Elections and the Secretary filed an answer and new matter denying that the Board of Elections must seek and receive the approval of the electors prior to using any EVS at the polling places within Westmoreland County.

In the new matter, the Board of Elections and the Secretary both argued that because the use of lever voting machines in elections for federal offices is prohibited by HAVA, and because Westmoreland County currently uses lever voting machines that do not meet the requirements of HAVA, they must procure a new EVS to comply with HAVA.

The Board of Elections contended that a referendum vote would be pointless because HAVA requires the EVS in elections for federal offices, and a vote of no would be of no import, other than to impede the implementation of HAVA, which must occur by the Spring Primary Election.

With respect to the Electors' request for injunctive relief, the Board of Elections and the Secretary argued that they would suffer greater harm than the Electors if the injunction were granted because Westmoreland County had received

federal funds in the amount $976,819.32 to replace its lever machines, and "if Westmoreland County should fail to replace its lever voting machines in time for the General Primary Election, the Commonwealth would be obligated to return [the $976,819.32] to the [Election Assistance Commission]." Pre–Hearing Memorandum of Law of Secretary in Opposition to Petitioners' Action for Declaratory Judgment and in Equity, Reproduced Record of Appellant (RR) at 115a.[4]

If the funds were to be returned, there is no evidence in the record to suggest that the federal government would make them available to Westmoreland County at any time in the future. To the contrary, the Commissioner of the Bureau of Commissions, Elections, and Legislation advised that the funds appropriated to Pennsylvania pursuant to HAVA were

> sufficient to cover only 25 to 35 percent of the total costs of purchasing [sic] lever voting machines in your county [and that] [c]onsequently, those counties with lever voting machines may need to fund some costs from their own budgets, including the use of a bond measure to cover a major portion of the costs of purchasing new voting systems to replace the lever voting machines.

* * *

> Congress has promised additional federal funding over the next two years that might become available for lever voting machine replacement. However, please be aware that it is possible that Congress will not appropriate funds sufficient to replace all lever voting machines in your county.

HAVA Bulletin # 1, RR at 327a. The record does not contain evidence establishing what additional funding, if any, would be required from Westmoreland County's budget to replace all of its lever machines.

The federal monies that the County received represented its share of the HAVA funds allocated to Pennsylvania in the amount of $23,000,000.00, pursuant to Section 102 of HAVA,

---

**4.** *See* Section 102(d) of HAVA, 42 U.S.C. § 15302(d)(1) (requiring repayment to the United States Election Assistance Commission of an amount equal to the non-compliant precinct percentage of the amount of funds provided to the state).

42 U.S.C. § 15302, to purchase the compliant voting system. The sole purpose of these funds was to replace lever voting machines and punch card voting systems with other voting systems that are compliant with HAVA. As a condition of receiving this payment, the Commonwealth was required to certify that it would use the payment to replace the old systems by the required deadline of May 16, 2006.

Further, Appellants argued that a grant of the injunction would have negative repercussions throughout the Commonwealth and would adversely affect the public interest because twenty-three other counties in Pennsylvania use lever voting systems, which must also be replaced in time for the Spring Primary Election in order to meet the requirements of HAVA. Those counties, too, would be subject to losing the HAVA funds if they did not replace their non-compliant systems with ones that meet HAVA criteria. Two counties, Mercer and Philadelphia, have already purchased the EVS.[5]

### Stipulated Facts

The parties have stipulated to the relevant facts. At the Spring Primary Election, nominees will be chosen for the offices of United States Senator, Governor, Lieutenant Governor, U.S. Representative, and members of the state General Assembly. The Spring Primary Election is an election for federal office pursuant to HAVA.[6]

In Westmoreland County, the Board of Elections has used mechanical lever voting machines for many years. The Board of Elections committed to procure an EVS to replace these machines in order to comply with HAVA. The EVS was to be used in elections for all offices and ballot questions that will be conducted in Westmoreland County in the Spring Primary Election and in all future elections.

5. The record does not indicate whether the issue of procuring the EVS was put to a referendum vote before the voters in those two counties. RR at 656a.

6. Because electors in the Commonwealth will be voting at the Spring Primary Election for a member of the United States Senate and member of the United States House of Representatives, the election is an election for federal office under HAVA. RR at 138a.

HAVA was enacted in October of 2002 in response to the debacle of the November 2000 presidential election.[7] As a condition of receiving its share of payments under HAVA for the replacement of lever machines with EVS, Pennsylvania filed with the U.S. Election Assistance Committee (EAC) a State Plan. This Plan involved public notice and a period of inspection. On June 28, 2003, the Secretary published a notice in the Pennsylvania Bulletin [8] that indicated how Pennsylvania intended to comply with HAVA. It provided a thirty-day comment period. Public hearings were held in July of 2003, and the final State Plan was published in the Federal Register on March 24, 2004.

Based on that Plan, Pennsylvania received its first HAVA funds in 2003, which included a payment of $23,000,000.00 under Section 102 of HAVA, 42 U.S.C. § 15302.

In developing the Plan in 2003, the Secretary sought advice from legal counsel for the Department of State regarding HAVA. The Secretary asked whether the mechanical lever machines met the requirements of HAVA and, if not, whether, pursuant to principles of federal preemption, the County boards of elections would be required to replace those machines for the Spring Primary Election. Twenty-four of Pennsylvania's sixty-seven counties use the mechanical lever voting machines.[9]

7. In his testimony regarding the Conference Report on H.R. 3295, Congressman Ney stated that "[t]he votes of an estimated 4 million to 6 million Americans went uncounted in November of 2000 [and that] [t]his national disgrace cried out for comprehensive Federal reform[,]" culminating in HAVA. 148 CONG REC. H7841 (daily ed. Oct. 10, 2002) (statement of Rep. Ney).

8. The Pennsylvania Bulletin is the official gazette of the Commonwealth of Pennsylvania. It is published weekly and, is, inter alia, the temporary supplement to the Pennsylvania Code, which is the official codification of agency rules and regulations and other statutorily authorized documents. Courts are required to take judicial notice of the Pennsylvania Bulletin.

9. Based on information in the record and contained in each State Plan, "[s]ixty-five percent of the precincts in 26 counties in Pennsylvania used lever voting machines at the November 2000 election. [RR at 623a, 626a]. Two of these counties, Mercer and Philadelphia, have since purchased DRE systems. Because HAVA requires that all voting sys-

The Secretary determined on June 18, 2003 that Section 301 of HAVA precluded the use of the lever voting machines in elections after January 1, 2006. He concluded that the twenty-four counties that used those machines had to replace them in time for use in the Spring Primary Election. He reiterated the requirement of Section 301(a)(2) of HAVA that each voting system "produce a permanent paper record with a manual audit capacity," [10] and that that record must be "available as an official record for any recount conducted with respect to any election in which the system is used." [11]

Accordingly, the Secretary determined that "HAVA requires the replacement of lever voting machines." RR at 326a (emphasis omitted). The Secretary issued HAVA Bulletin # 1, entitled Federal Funding for Replacing Voting Systems in Pennsylvania: Lever Type Voting Machines and Additional Requirements for All Counties (HAVA Bulletin), which stated, *inter alia,* that:

> **it is the opinion of this office that HAVA preempts the Pennsylvania constitutional and statutory provisions that require approval of a referendum before a county uses an electronic voting system. Pennsylvania law is preempted because it presents an obstacle to the accomplishment and execution of Congress' command to replace lever voting machines. It is the opinion of this office that a county could not rationally justify adopting a new voting system for federal elections while using another system for state elections.** Maintaining two voting systems would cause voter confusion and perpetuate a system that is less reliable in the conduct of an accurate and verifiable recount. **Therefore, based on principles of fed-**

tems have a manual audit capacity, the 24 counties now using lever voting machines *must* replace them." Brief of Appellant at 16 (internal citations omitted). Of the twenty-six counties that used lever machines in the November 7, 2000 election, six counties also used paper ballots. RR at 623a, 626a. One county used paper ballots along with a DRE system, and eleven counties used only non-compliant punch card systems. *Id.*

10. 42 U.S.C. § 15481(a)(2)(B)(i).

11. 42 U.S.C. § 15481(a)(2)(B)(iii).

**eral preemption and equal protection, this office believes that counties with lever voting machines cannot and should not place a referendum on their ballots to purchase new electronic voting systems.**

*Id.* at 326a–27a (emphasis added).

On December 29, 2005, the Board of Elections adopted a resolution regarding its intent to purchase the EVS.[12] No contract or lease or other binding agreement has yet been executed. In order to use the new EVS, it was necessary for the Board of Elections to move quickly to execute an agreement in time to receive the equipment and prepare it for use in the election. The Board of Elections determined that to comply with HAVA, it must procure the EVS to use in all county polling places. The Election Board concluded that use of the mechanical lever voting machines for any purpose would violate the requirements of HAVA.

The deadline for HAVA compliance is the first election for federal office held after January 1, 2006. In Pennsylvania, this is the Spring Primary Election. If a State has received HAVA funds and does not meet the deadline, the State must repay the funds.

Thus, if the Board of Elections does not replace the mechanical lever machines with the EVS for use in the upcoming election, it would be required to repay the $976,819.32. Westmoreland County would not be able to use those funds that it had received to replace its machines. This is also true with respect to the other twenty-three counties in Pennsylvania that use lever voting machines.

### The Commonwealth Court Hearing and Order

On February 7, 2006, an expedited hearing on the permanent injunction was held before Commonwealth Court Judge Dante Pellegrini. The Electors did not present any witnesses.

Appellants presented testimony from William Boehm (Boehm), the Director of the Office of Policy in the Depart-

---

12. According to the Commonwealth Court, the Secretary intends to purchase the EVS from Election Systems and Software, Inc.

ment of State. He testified that the Department of State is the agency that is responsible for administration of elections at the state level and is obligated to follow the Election Code, as well as any federal laws that might control federal elections. RR at 646a. Boehm noted that the law implementing EVS in Pennsylvania was enacted in 1981 and that he had participated in the examination of voting systems. *Id.* at 647a. He testified that HAVA "was enacted as a reaction to the events that occurred in Florida during the 2000 election, specifically with regard to the voter confusion that took place.... [I]t actually represented ... an election reform movement...." *Id.* at 648a. Boehm stated that the simultaneous use at the Spring Primary Election of two different voting systems, one for federal elections and one for state elections, would be extremely costly and impractical. Further, according to him, "[t]he Election Code is drafted in such a way that it talks about uniformity and an integrated system. It does not address the possibility of ... voters using two distinct systems on the same election day." *Id.* at 669a. Further, in response to the question posed of "if Westmoreland County does not become compliant in the opinion of the Department of State by May 2006, we're going to lose that money, aren't we," Boehm answered, "[t]hat's true." *Id.* at 698a.

Boehm stated that a dual voting system would require two different types of ballots that would have to be simultaneously used and displayed; twice as many polling workers to be trained to operate two different devices; two sets of voting data to be tabulated and certified; and each voter would have to vote twice on two different devices.

Boehm also testified that the Department of State never considered using two different voting systems because it would cause voter confusion. This problem would arise regardless of whether federal elections were held in even years and municipal elections for state or local offices were held in odd years; or where electors had to vote for both federal and state officials at the same election. Voters would be required

to learn two different voting systems for the different elections.

Also testifying was Mark Wolosik (Wolosik), the Allegheny County Elections Division Manager, who explained how the lever voting machines worked, why they did not comply with HAVA, and how they were subject to breaking down. He concurred with Boehm's testimony that using a two-system voting process would be extremely difficult on an election board, both financially and physically. Wolosik focused on the fact that voters would be confused with two different voting systems, along with the costs of storing the machinery for two voting systems and of training personnel to handle the elections. He believed that a paper ballot voting system would be just as difficult to handle due to the huge volume of paper ballots that would be needed, which, in his estimation, would require the Allegheny County Board of Elections to print approximately one million ballots.

Paula Pedicone (Pedicone), Director of Elections for Westmoreland County, testified regarding the Board of Elections' procurement of bids and the timeline involved in attempting to comply with HAVA. She concurred with the testimony of Wolosik regarding the difficulties that the Board of Elections would encounter utilizing a dual-scheme voting system.

Counsel for the Electors posited that the Pennsylvania Constitution and the Election Code require the decision to procure a new voting system to be put on a referendum and that HAVA does not preempt the Pennsylvania Constitution and/or the Election Code because there is no conflict between them. Therefore, they concluded that there is no impediment to utilizing one voting system for HAVA and a separate voting system for state and local elections.[13] Counsel for the Board of Elections and the Secretary noted that the Commonwealth utilizes a unitary voting system, which is inconsistent with the dual voting format. Because HAVA requires the replacement of the lever voting machines, the Secretary argued that HAVA preempts the Pennsylvania Constitution and the Election

13. The Electors agreed at trial that the current method of voting using a lever system in Westmoreland County did not comply with HAVA.

Code since the referendum requirement delineated therein is an obstacle to complying with HAVA.

On February 13, 2006, in a single-judge unpublished Opinion, the Commonwealth Court granted the relief sought by the Electors, and, on February 16, 2006, the court denied post-trial relief. The court issued a declaratory Order and an injunction preventing the Appellants from purchasing any EVS for Westmoreland County until a majority of the voters of that county approved such purchase by referendum vote.

The Commonwealth Court acknowledged the genesis of HAVA as a "response to problems that arose from the last presidential election relative to both voting and counting the votes" and that HAVA requires each state to install a compliant voting system to use in federal elections. Commonwealth Court Opinion at 8.

Further, the court cited Article VII, Section 6 of the Pennsylvania Constitution, which provides that:

> **the General Assembly shall, by general law, permit the use of voting machines, or other mechanical devices for registering or recording and computing the vote, at all elections or primaries,** in any county, city, borough, incorporated town or township of the Commonwealth, **at the option of the electors** of such county, city, borough, incorporated town or township. . . .

Pa. Const. art. VII, § 6 (emphasis added).

Consistent with that constitutional provision, in 1937 the General Assembly authorized the installation of voting machines, pursuant to Section 1102 of the Election Code, 25 P.S. § 3002:

> Any county, city, borough or township may, by a majority vote of its qualified electors voting thereon cast at any general or municipal election, authorize and direct the use of voting machines for registering or recording and computing the vote at all elections held in such county, city, borough or township, or in any part thereof.

In 1980, the Election Code was amended to allow for electronic voting machines. The Code provides that a majori-

ty of qualified electors must approve the adoption of an EVS, pursuant to Section 1104–A, 25 P.S. § 3031.4(a) (**Installation of electronic voting systems**):

(a) **If a majority of the qualified registered electors voting on the question in any county or municipality vote in favor of the adoption of an electronic voting system, the county board of elections of that county shall purchase, lease, or otherwise procure for each election district of such county or municipality, the components of an electronic voting system of a kind approved,** as hereinafter provided, by the Secretary of the Commonwealth, and the board shall thereafter notify the Secretary of the Commonwealth, in writing, that they have done so.

25 P.S. § 3031.4(a) (emphasis added).

Accordingly, the court held that the Election Code "does mandate that it is up to the voters of the Commonwealth to decide if an [EVS] will be utilized." Commonwealth Court Opinion at 16. The court also found that, contrary to the arguments of the Secretary, laches did not bar the Electors' suit because they had no reason to file a claim until they were aware that the Board of Elections was not going to allow them to vote to decide whether an EVS should be used. The Electors did not receive this information until December 22, 2005.

The court rejected the Secretary's argument that because the Commonwealth has a unitary voting system, which encompasses both state and federal elections, when the federal government changed the law to require replacement of lever machines in federal elections, the General Assembly acquiesced in that decision. The Secretary had relied on Article VII, Section 6 of the Pennsylvania Constitution, to support that position, for that Section provides, *inter alia,* that "the General Assembly shall, by general law, permit the use of voting machines, or other mechanical devices for registering or recording and computing the vote, at all elections or primaries." However, the Commonwealth Court reasoned

that the Election Code addresses and controls state elections and not federal elections.

The Commonwealth Court found the principle of "conflict" preemption inapplicable in the matter before us. This theory provides that state law may be displaced if it is physically impossible to comply with both state and federal laws, or if the state law stands as an obstacle to the accomplishment and execution of the purposes and objectives of Congress. *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381–82 (3d Cir.1999), *cert. denied*, 529 U.S. 1012, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000). The Commonwealth Court found no conflict preemption here because "nothing in HAVA makes it physically impossible to comply with HAVA by requiring the displacement of mechanical voting machines that are legal under the Election Code." Commonwealth Court Opinion at 22.

> All that HAVA does require is that a compliant voting system be used for federal elections. While it may present difficulties, nothing forecloses the Board of Elections from using paper ballots for two or three federal elections every two years or ... to purchase [EVS] in those years. In addition, the physical impossibility was created by not placing before the public a referendum as required by state law as to whether they wanted to change to an [EVS].... Since the time HAVA was enacted up through the time of this trial, it has never been an impossibility to comply with HAVA and still follow state laws at the same time.

*Id.* at 23–24.

Refusing to apply conflict preemption, the Commonwealth Court issued a permanent injunction, concluding that the harm in granting the injunction was less than the harm in refusing it. Further, it opined that any voter confusion resulting from the use of two different types of voting systems "can largely be ameliorated by voting district election workers explaining the different voting systems." *Id.* at 25. However, we find the opposite. This determination of the Commonwealth Court was not supported in the record and, in fact, directly contra-

dicted the testimony of state election officials who believed that a dual system would wreak havoc at the polls.

The court noted that the resulting burdens did not justify not following the Pennsylvania Constitution or the Election Code, and that when the citizens adopted Article VII, Section 6 of the Pennsylvania Constitution, they "thought that the manner and counting of voting was so important that it had to be adopted with the consent of the voters so that confidence in the outcome of state and local elections and in state and local democracies would be maintained." *Id.* at 26. Accordingly, the court enjoined the Appellants from entering into a contract to buy any EVS until the question is posed to the electors in Westmoreland County and they approve such purchase.[14]

The Secretary filed a direct appeal of that Order with this Court, asserting that disposition was needed by March 3, 2006, because that was the last date on which counties could contract with vendors to obtain new voting machines in time for the Spring Primary Election. We scheduled the matter for oral argument on March 1, 2006, and, immediately after argument, we issued an Order vacating the permanent injunction and reversing the Order of the Commonwealth Court. This Opinion follows that Order.

## DISCUSSION

In this case, we are asked to perform the weighty task of reconciling the requirements of a critically important federal act designed to remedy the type of voting irregularities that occurred in Florida during the 2000 presidential election with important provisions of Pennsylvania's Election Code and Constitution. Simply put, the dilemma that we address arises from the interplay of federal and state provisions: federal law in HAVA requires Westmoreland County to replace its lever voting machines with EVS in elections for federal offices at the Spring Primary Election, and state law mandates that a

14. Although the Order grants a preliminary injunction, the Opinion clearly addresses a permanent injunction and is couched in terms of a final Order.

referendum of voters must be held to approve that change from lever machines to EVS units. No such referendum was held, and the Secretary advised State election officials that federal law preempts the state provisions, and that no referendum was necessary to replace the lever machines with EVS. The Commonwealth Court enjoined the Appellants from purchasing the EVS until a referendum is held.

Complicating the resolution of the instant matter is the fact that both the state and the federal provisions that we analyze involve the fundamental right to vote. In testimony on the Conference Report on H.R. 3295, Help America Vote Act of 2002 (hereinafter the House Report), Rep. DeLauro articulated that:

> [t]he right to vote is a cornerstone of our democracy, the basic and most essential expression of citizenship. When that right is put into doubt, when citizens cannot know that a ballot cast is a ballot counted and that their unique voice has not been heard, it undermines confidence of entire political system. . . . People simply must have the confidence that their **vote** counts. That is what this legislation is about.

148 CONG. REC. H7848 (daily ed. Oct. 10, 2002) (statement of Rep. DeLauro).

 The Commonwealth Court ordered that a dual system of voting be used at the Spring Primary Election, with voting for state and local offices done on the lever machines, as had been the case for many years, and voting for federal offices conducted by using paper ballots, which are HAVA compliant.[15]

---

15. Appellants correctly point out that the Commonwealth Court's finding ignores the fact that "the first option it ordered, paper ballots, does not comply with HAVA requirements for access for the disabled." Brief of Appellant at 12. HAVA requires a voting system to "be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters." 42 U.S.C. § 15481(a)(3)(A). Undoubtedly, a blind or visually impaired voter would be hard-pressed to complete a paper ballot with any degree of privacy or independence.

## I. The Grant of the Permanent Injunction

■ By granting the permanent injunction enjoining the purchase of the HAVA-compliant EVS, the Commonwealth Court was the architect of a scenario that required the use of two separate voting systems in the forthcoming Spring Primary Election: an elector voting for the candidates for federal offices would have to cast a paper ballot; the same elector, when voting for candidates for state and local offices, would vote on a lever machine. The injunction was so broad in its sweep that it precluded the purchase of even one EVS at each polling place for use by disabled individuals when voting in elections for federal offices. The Electors themselves concede that the court erred in barring this. "Petitioners acknowledge that the Respondents certainly must provide for accessible voting for persons with disabilities." Brief of Appellees at 5.

■ In reviewing a grant of a permanent injunction, our standard of review is *de novo,* and our scope of review is plenary. *Buffalo Twp. v. Jones,* 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002) ("[A]ppellate review in these cases is whether the lower court committed an error of law in granting or denying the permanent injunction. Our standard of review for a question of law is de novo. Our scope of review is plenary.") (internal citation omitted).

To justify the award of a permanent injunction, the party seeking relief "must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested." *Harding v. Stickman,* 823 A.2d 1110, 1111 (Pa.Cmwlth. 2003).

■ When the Commonwealth Court granted the injunctive relief that Electors requested, it did not provide an analysis pursuant to the three criteria delineated in *Harding.* In fact, it provided little explanation of how it arrived at its decision to issue the injunction.[16] As a result, we must perform our own

---

16. In a footnote, the Commonwealth Court cited one case establishing the criteria required to justify issuance of a preliminary injunction. Commonwealth Court Opinion at 3–4 n. 5

review of each criterion, in conjunction with the findings of the Commonwealth Court, to determine if the Electors met the requirements for extraordinary relief.[17] Having conducted this analysis, we determine that the Electors did not and that the Commonwealth Court erred by granting the permanent injunction.

### A. Electors Did Not Demonstrate a Clear Right to Relief.

The first criterion in justifying the grant of a permanent injunction requires the Electors to establish a clear right to relief. *Buffalo Twp.*, 813 A.2d at 663. The Commonwealth Court did not make mention of this criterion; however, the court implicitly found that this clear right to relief was met with its grant of the injunction. The conclusion of the court rested upon two factors: (1) its rejection of the Secretary's argument that, because the Commonwealth uses a unitary system of voting, the change in federal law requiring EVS units in elections for federal office mandates a similar change in elections for state and local office; and (2) its determination that "conflict preemption" did not apply to allow HAVA to displace the state-required referendum because "nothing in HAVA makes it physically impossible to comply with HAVA by requiring the displacement of mechanical voting machines that are legal under the Election Code." Commonwealth Court Opinion at 22. With respect to both of these factors, we find that the Commonwealth Court erred.

### 1. The Election Code Establishes a Unitary Voting System.

The Commonwealth Court created a dual system of voting for the Spring Primary Election.

[T]he Election Code does not mandate that electronic voting systems be used for state and local elections because paper

---

17. We address only the criteria of the right to clear relief and the presence of harm, as it is clear that the Electors have established the inadequacy of damages to compensate for an inability to vote in a referendum.

ballots may still be utilized, it is not impossible to comply with both state and federal laws regarding the upcoming elections—**it just requires that two different types of voting mechanisms or systems may be used; one for the state and local elections and another for the federal election.**

*Id.* at 24 (emphasis added) (footnote omitted).

In doing this, the Commonwealth Court ignored unrebutted testimony at the hearing and provisions of our Election Code, both of which establish that this dual system is inconsistent with the unitary system of voting in Pennsylvania. There are no provisions in our Election Code for separating the elections for federal offices from the elections for state and local offices. As the Secretary correctly noted, Article VII, Section 6 of the Pennsylvania Constitution provides that:

> **[a]ll laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State,** except that laws regulating and requiring the registration of electors may be enacted to apply to cities only: Provided, That such laws be uniform for cities of the same class, and except further, that **the General Assembly shall, by general law, permit the use of voting machines, or other mechanical devices for registering or recording and computing the vote, at all elections or primaries, in any county,** city, borough, incorporated town or township **of the Commonwealth, at the option of the electors of such county,** city, borough, incorporated town or township, without being obliged to require the use of such voting machines or mechanical devices in any other county, city, borough, incorporated town or township, under such regulations with reference thereto as the General Assembly may from time to time prescribe.....

Pa. Const. art. VII, § 6 (emphasis added). This constitutional provision speaks of uniformity with respect to the laws that regulate elections in the Commonwealth and, by its terms, does not differentiate between elections for federal and state office.

Counsel for the Secretary argued that Article VII, Section 6 addressed federal and state laws and that once a federal law is passed, the uniformity requirement warrants that anything encompassed by this provision must follow suit. RR at 776a. An exception to this principle would be if the state election provision did not thwart the federal one, which was inapposite to the instant matter, where the referendum requirement acted as an obstacle to HAVA compliance. Based on our review of the relevant provisions in the Election Code and the testimony of record, we agree with this analysis and conclusion. The goals of HAVA, most particularly with respect to ensuring access to the disabled at the Spring Primary Election, would be inexorably impeded by upholding the Commonwealth Court's Order.

The Commonwealth Court held that "the Election Code only portends to have control over state elections when [sic] defines 'election' as 'any general, municipal, special or primary election,' **none of which include a federal election.**" Commonwealth Court Opinion at 20 (emphasis added) (footnote omitted). However, this statement ignores the fact that the Election Code contains numerous provisions relating to federal elections. *See* 25 P.S. § 2753 ("The vote for candidates for the office of President of the United States, as provided for by [the Election Code], shall be cast at the General primary."); 25 P.S. § 2702 ("[T]he court of common pleas of the county in which the same are located, may form or create new election districts ... from which any Federal, State, county, municipal or school district officers are elected...."); 25 P.S. § 2621(c) (empowering the Secretary "[t]o certify to county boards of elections for primaries and elections the names of the candidates for [, *inter alia*,] President and Vice–President of the United States, presidential electors, United States senators, [and] representatives in Congress"); 25 P.S. § 2862 ("All candidates of political parties ... for the offices of United States Senator [and] Representative in Congress ... shall be nominated ... and party delegates ... who ... are required to be elected ... shall be elected at primaries held in accordance with the provisions of [the Election Code].... In the

years when candidates for the office of President of the United States are to be nominated, every registered and enrolled member of a political party shall have the opportunity at the Spring primary in such years to vote his preference. . . .").

The Election Code contains no provisions for separating elections for federal officials from the elections for state offices. Many provisions of the Code could not be fulfilled if we were to affirm the dual system that the Commonwealth Court ordered. For example, county boards of elections are specifically obligated "[t]o instruct election officers in their duties, calling them together in meeting whenever deemed advisable, and to inspect systematically and thoroughly the conduct of primaries and elections in the several election districts of the county **to the end that primaries and elections may be honestly, efficiently, and uniformly conducted.**" 25 P.S. 2642(g) (emphasis added). *See* also 25 P.S. § 3007(b) (requiring that a voting machine "shall permit each voter, at other than primary elections, to vote a straight political party ticket **in one operation.** and, **in one operation,** to vote for . . . **all** the candidates of one political party for every office to be voted for") (emphasis added); 25 P.S. § 3010(h) (requiring that "[t]he names of **all** candidates of a political party shall appear in the same row or column" at a voting machine so that an elector may **"in one operation,** vote for **all** the candidates of that political party for every office to be voted for") (emphasis added); 25 P.S. § 3010(j) (requiring for primary elections that the "names of **all** the candidates seeking nomination in any one political party shall appear on **one** machine") (emphasis added). We have held that "to be uniform in the constitutional sense . . . a law [regulating the holding of elections] must treat all persons in the same circumstances alike." *Kerns v. Kane,* 363 Pa. 276, 69 A.2d 388, 393 (1949).

These statutory provisions are consistent with the uniformity of voting clause in Article VII, Section 6, which emphasizes that when a particular method of voting is used, it must be done "at all elections or primaries." This indicates that if lever machines are used in Westmoreland County, they are to

be used "at all elections or primaries." If HAVA requires that EVS be used to provide access to the disabled, they are to be used "at all elections or primaries." Pursuant to this Article, and the provisions that implement it in the Election Code, electors are given the option to choose their voting systems for all primaries and all elections. The Election Code furnishes a unitary procedure by which the voters exercise those rights, and neither the Pennsylvania Constitution nor the Election Code provides for voters to approve a voting system for state and local office where federal law has mandated that system for elections for federal office.

William Boehm, the director of the Office of Policy in the Department of State, confirmed the unitary nature of Pennsylvania's system of voting and testified that the provisions of the Election Code that relate to primaries require all candidates of one party to be on one machine. Additionally, in the fall election, the Code requires that an individual be given the opportunity to vote a straight party ticket in one mark or act, which would be impossible with two voting systems. RR at 671a–672a.

Boehm described numerous problems that would arise were a dual voting system employed. One such example was the issue as to "how would you ensure that a voter has voted on both machines for federal office, for state office. It would be very difficult to track, especially if there's a large turnout." *Id.* at 672a. Additionally, he noted that:

two distinct systems at a given election .... would have been incomprehensible to us as election administrators. The Election Code is drafted in such a way that it talks about uniformity and an integrated system. It does not address the possibility of ... voters using two distinct systems on the same election day.

\* \* \*

[T]he Election Code simply doesn't even discuss the possibility of using two separate systems on an election day. *Id.* at 669a, 671a.

The testimony of Mark Wolosik, the Allegheny County Elections Division Manager, also established that a dual sys-

tem that used the lever machines for state and local offices and the EVS for federal offices was outside of the realm of the Election Code because there were no provisions in that Code that would "in any way, shape or form regulate how this ... two-system voting process" could be accomplished in any uniform manner. *Id.* at 732a. Further, Wolosik noted that in his "30–plus, 35 years of experience in election administration," he had never heard of such a system being used anywhere else in the country. *Id.* at 729a.

Despite the fact that the Election Code, the Pennsylvania Constitution, and the testimony of experienced election officials contemplated a unitary system of voting in Pennsylvania, the Commonwealth Court chose to impose a dual system on Pennsylvania, finding Electors had the right to injunctive relief:

> [w]hile it may present difficulties, nothing forecloses the Board of Elections from using paper ballots for two or three federal elections every two years or, if they desire, to purchase electronic voting machines in those years. In addition, the physical impossibility was created by not placing before the public a referendum as required by state law as to whether they wanted to change to an electronic voting system.

Commonwealth Court Opinion at 23.

The Commonwealth Court erred by failing to acknowledge that the system of voting in Pennsylvania is unitary, as established by the testimony of those who administer that system, the Election Code, and Article VII, Section 6 of the Constitution. Its conclusion that statutory law in Pennsylvania contemplates the dual system that it engineered lacks support. Accordingly, because Pennsylvania has a unitary system of voting, which cannot accommodate the dual mechanism set forth by the Commonwealth Court, Electors did not establish a clear right to injunctive relief.

### 2. HAVA Preempts the State Referendum.

The second factor that the Commonwealth Court used to justify its enjoining the purchase of the EVS was its

rejection of the Secretary's position that the state referendum requirement was preempted by HAVA pursuant to the theory of conflict preemption. Here, too, the Commonwealth Court committed legal error. The Electors did not establish a clear right to relief because the state referendum requirement constitutes an obstacle to the goals of HAVA and, accordingly, is preempted.

The Secretary argued that because the use of lever voting machines in elections for federal offices is prohibited by HAVA, and the current machines in Westmoreland County are non-compliant lever machines, the EVS units must be purchased and the Pennsylvania statutory and constitutional provisions requiring a voter referendum must give way in this instance. Further, the Secretary contended that it is senseless to require voting on the issue of replacing lever machines with the EVS because a negative vote would have no significance because the EVS machines are required to be used at the Spring Primary Election. We agree.

### a) The Commonwealth Court Did Not Utilize the Criteria Required to Determine the Applicability of Conflict Preemption.

The principle of preemption is grounded in the Supremacy Clause of the United States Constitution, which states that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Constitution, art. VI. "Since . . . *McCulloch v. Maryland*[, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819)], it has been settled that state law that conflicts with federal law is without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citation and internal quotation marks omitted).

 The Commonwealth Court found that none of the three types of preemption applied.[18] It correctly concluded

---

**18.** The three types of preemption include "express preemption," "field preemption," and "conflict preemption," pursuant to *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, (3d Cir.1999), *cert. denied*, 529 U.S.

that express and field preemption did not apply because there was no explicit statutory language in HAVA indicating that state law is to be displaced and federal law did not so thoroughly occupy the field as to leave no room for the states regarding voting matters.

However, by focusing on only one of the prongs used in determining whether conflict preemption is applicable, the court erred by finding that conflict preemption did not apply. The court referred to the assessment set forth in *Orson*, where the Third Circuit described the conflict preemption principle and the criteria for its application:

> [S]tate law may be displaced under conflict preemption principles **if the state law in question presents a conflict with federal law in one of two situations:** when it is impossible to comply with both the state and the federal law, **or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.**

*Orson*, 189 F.3d at 381–82 (citations omitted) (emphasis added). In our decision in *Office of Disciplinary Counsel v. Marcone*, 579 Pa. 1, 855 A.2d 654 (2004), we used this same analysis of conflict preemption and stated:

> a state enactment will be preempted where a state law conflicts with a federal law. *Id.* Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law, *Florida Lime Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

*Id.* at 664.

Thus, regarding conflict preemption, there are two situations that warrant preemption: (1) if complying with both

1012, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000). Only conflict preemption is relevant to the matter *sub judice*. Commonwealth Court Opinion at 20.

state and federal laws is physically impossible; **or** (2) if "state law stands as an obstacle to the accomplishment and execution of the purposes and objectives of Congress." Commonwealth Court Opinion at 18 (citing *Orson*, 189 F.3d at 381–382) (emphasis added). However, while the court acknowledged that two scenarios may warrant the application of conflict preemption, it addressed only one: "Nothing in HAVA makes it physically impossible to comply with HAVA by requiring the displacement of mechanical voting machines that are legal under the Election Code." Commonwealth Court Opinion at 22. Expounding on its theme of impossibility, the court held that it was not physically impossible to reconcile HAVA with state law because paper ballots could be used for the federal offices until such time as the voters would approve the EVS through referendum.

The Commonwealth Court correctly and compellingly articulated the importance of allowing Pennsylvania's citizens to choose the system by which they cast their votes:

> The citizens of the Commonwealth, when adopting Article VII, Section 6 of the Pennsylvania Constitution, thought that the manner and counting of voting was so important that it had to be adopted with the consent of the voters so that confidence in the outcome of state and local elections and in state and local democracies would be maintained.

Commonwealth Court Opinion at 22.

 We do not take issue with that statement of the Commonwealth Court; however, this right to choose a voting system, fundamental as it is, does not stand alone or operate in a vacuum and does not validate the use of only the physical impossibility standard. While it may be true that it is not physically impossible to use paper ballots in one set of elections along with lever voting machines in another, the uncontroverted testimony at the hearing established that it would be tremendously difficult to do so.[19] Having made its determina-

---

19. State election officials testified that the dual system ordered by the Commonwealth Court would cause, *inter alia*, voter confusion and increased possibility of error in casting and tabulating votes and would pose significant problems based on the unitary system of voting pre-

tion that physical impossibility did not apply here, the Commonwealth Court did not consider the question of whether the referendum requirement "st[ands] as **an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."**

"The United States Supreme Court has interpreted 'stands as an obstacle' to mean that [ ] 'a state law also is preempted if it interferes with the methods by which the federal statute was designed to reach this goal.'" *Cellucci v. Gen. Motors Corp.,* 550 Pa. 407, 706 A.2d 806, 809–810 (1998) (quoting *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)). The state law "must give way" where it "conflicts with, or frustrates, federal law." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

The Supreme Court has held that what constitutes a "sufficient obstacle" for purposes of conflict preemption "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

Further, jurisprudence from this Court militates against the standard of "physical impossibility" that the Commonwealth Court utilized in the matter *sub judice.* In determining whether conflict preemption applied in *Marcone,* we noted that the question was whether "our regulation of the maintenance of a law office **significantly frustrates** the accomplishment of the purposes of Congress." *Office of Disciplinary Counsel v. Marcone,* 579 Pa. 1, 855 A.2d 654, 665 (2004) (emphasis added).[20]

Accordingly, in reviewing whether the Commonwealth Court erred by finding that conflict preemption did not apply,

---

scribed in the Election Code. All of these factors could lead to the inexorable disenfranchisement of voters.

**20.** In *Marcone,* we held that conflict preemption did not apply regarding the regulation of the maintenance of a law office of an attorney suspended from practice in Pennsylvania because the applicable federal rules and Commonwealth rules can coexist. *Id.*

we must examine the entire federal statute, in this case, HAVA, along with assessing its purpose and effects. The Commonwealth Court did not perform an adequate analysis of HAVA and gave short shrift to that Act's purposes, concluding only that "[a]ll that HAVA does require is that a compliant voting system be used for federal elections." Commonwealth Court Opinion at 23. While that is a true statement, it fails to acknowledge the far broader purposes set forth by the federal law.

The Commonwealth Court recognized that the purpose of HAVA was to remedy the problems that arose in the 2000 presidential election regarding voting and the counting of votes. It cited the testimony of Boehm that HAVA "was an effort to modify the federal election laws to ensure that there were standards with . . . the various voting devices that are used in the states. And it actually represented . . . an election reform movement. . . ." Commonwealth Court Opinion at 8 n. 11 (internal quotation marks omitted).[21] The court also referred to Boehm's statement that "the meaning of the election reform [in HAVA]" was to improve public confidence in elections. *Id.* at 9. Despite its recognition of these goals, the court found that HAVA did not preempt state law.

### b) HAVA's Purpose and Intended Effects Warrant a Finding of Preemption.

Pursuant to the requirements of HAVA, states must install a voting system[22] to be used in federal elections.

21. Boehm referred to the use of punch cards in Florida and the lack of standards pertaining to them, which resulted in issues regarding what constituted a vote. Commonwealth Court Opinion at 8 n. 11.

22. HAVA defines a voting system as:
 (1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—
 (A) to define ballots;
 (B) to cast and count votes;
 (C) to report or display election results; and
 (D) to maintain and produce any audit trail information; and
 (2) the practices and associated documentation used-

Section 301 provides that "[e]ach voting system used in an election for Federal office," must meet the criteria set forth in Section 301(a) of HAVA, 42 U.S.C. § 15481(a). While HAVA clearly states that its requirements pertain to federal elections, as we discussed *supra*, the system of voting in Pennsylvania is a unitary one, and the offices to be elected at the Spring Primary Election are federal, state, and local.

Key to our analysis in this matter are particular requirements of Section 301, which mandate that: (1) the voting system, whether paper ballot, punch card, or central count system, have a manual audit capacity;[23] (2) the voting system be accessible to individuals with disabilities, including accessibility for the blind;[24] and (3) the voting system, for purposes of verifying the accuracy of one's vote before leaving the booth, include at least one EVS equipped for people with disabilities at each polling place.[25]

It is undisputed that the lever machine voting system in Westmoreland County does not comply with the manual audit capacity requirement of Section 301 of HAVA. At the hearing, the court asked counsel for the Electors whether he disputed

> **(A)** to identify system components and versions of such components;
> **(B)** to test the system during its development and maintenance;
> **(C)** to maintain records of system errors and defects;
> **(D)** to determine specific system changes to be made to a system after the initial qualification of the system; and
> **(E)** to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).
>
> 42 U.S.C. § 15481.

**23.** "The voting system shall produce a permanent paper record with a manual audit capacity for such system." 42 U.S.C. § 15481(a)(2)(A).

**24.** The voting system "shall ... be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters." 42 U.S.C. § 15481(a)(3)(A).

**25.** "The voting system shall ... satisfy [the provision requiring voters to verify that they have cast their vote accurately] through the use of at least one direct recording [EVS] or other voting system equipped for individuals with disabilities at each polling place." 42 U.S.C. § 15481(a)(3)(B).

that the "voting machines are not in compliance with HAVA" and counsel responded, "No." RR at 759a.

While the specific methods of complying with HAVA are left to the discretion of each state, the deadline for the replacement of the lever and punch card voting systems is the first election for federal office held after January 1, 2006, which for Westmoreland County is the Spring Primary Election. 42 U.S.C. § 15302(a)(3)(B).

In order to effectuate the installation of a HAVA-compliant voting system, the federal government provided funding to each state, 42 U.S.C. § 15302(a)(1), with provisions for repayment of the funds if the state does not meet the deadline for replacement of the voting machines.

The crux of the Electors' argument below was that the Board of Elections, prior to replacing the lever machines with EVS, must comply with the referendum requirement found at Sections 1102–A through 1104–A of the Election Code, 25 P.S. §§ 3031.2–3031.4. They argued that the Board of Elections must submit "a question to the voters" that asks, "[S]hall an electronic voting system be used at [the] polling places" in Westmoreland County? 25 P.S. § 3031.3(a).

Undoubtedly, the lever machines cannot be used for the election of federal offices at the Spring Primary Election. Acknowledging this, the Commonwealth Court determined, however, that "nothing forecloses the Board of Elections from using paper ballots [26] for two or three federal elections every two years or, if they desire, to purchase electronic voting machines in those years." Commonwealth Court Opinion at 23. With its Order, the Commonwealth Court engineered a

26. The Commonwealth Court noted that utilizing paper ballots that are counted manually is the default method of voting and computing votes, pursuant to the Pennsylvania Constitution. Commonwealth Court Opinion at 15. Further, it determined that paper ballots are HAVA-compliant. Although an election official testified that paper ballots are HAVA-compliant, his conclusion, when viewed in the context of his earlier testimony, appears to relate only to the HAVA requirement regarding a paper record allowing for an audit trail. RR at 690a, 663a. We have concluded that the Commonwealth Court erred because the paper ballot does not meet the HAVA access requirements. *See* n. 15.

dual system of voting: [27] *Id.* at 24. ("[I]t is not impossible to comply with both state and federal laws regarding the upcoming elections—it just requires that two different types of voting mechanisms or systems may be used; one for the state and local elections and another for the federal election.").

The Secretary maintained that the conduct of such a referendum is a "meaningless" act because Westmoreland County must obtain the EVS to comply with HAVA, regardless of the outcome of such a referendum. Therefore, the only effect of a conducting a referendum in these circumstances would be to serve as an obstacle to complying with HAVA by the required deadline, which is the Spring Primary Election. We agree.

### (i). Improving Accessibility of Polling Places to Individuals with Disabilities is a Fundamental Goal of HAVA.

In determining whether HAVA preempts the referendum requirement, several sections of HAVA are relevant to our analysis. First, Title I of HAVA, "Payments To States For Election Administration Improvements And Replacement Of Punch Card And Lever Voting Machines," authorizes payments to states to carry out, *inter alia:* (1) improvements in the administration of federal elections; (2)voter education regarding voting procedures, voting rights and voting technology; (3) training of election officials, poll workers and volunteers; (4) improving voting systems; and (5) enhancing the "accessibility and quantity of polling places" for individuals with disabilities. 42 U.S.C. § 15301(b)(1).

Of the $650,000,000.00 in funding appropriated pursuant to HAVA, fully one-half was allocated for payments under Section 101. 42 U.S.C. § 15304(a)(1). A paramount goal of this section is "[i]mproving the accessibility and quantity of polling places, including providing physical access for individuals with

27. Although the Commonwealth Court did not specifically articulate the second component of the dual system, it is implicit in its *Opinion* that it envisioned the use of the lever machines in elections for state and local offices, with the paper ballots used simultaneously in the federal elections.

disabilities, providing nonvisual access for individuals with visual impairments...." 42 U.S.C. § 15301(b)(1)(G).

Congress made it clear that:

[t]he unprecedented Federal assistance: $3.9 billion over 3 years to **help** States improve and upgrade every aspect of their election systems [including] replac[ing] outdated voting equipment, train[ing] poll workers, educat[ing] voters, upgrad[ing] voter lists, and **mak[ing] polling places accessible for the disabled.**

\* \* \*

[T]his legislation prescribes an array of new voting rights and responsibilities. **States will now be required to provide provisional balance to ensure no voter is turned away at the polls.**

48 CONG. REC. H7841 (daily ed. Oct. 10, 2002) (statement of Rep. Hoyer) (emphasis added).

HAVA requires that voting systems be accessible to individuals with handicaps:

The voting system shall—

(A) be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters; [and]

(B) satisfy the requirement of subparagraph (A) through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place.

42 U.S.C. 15481(a)(3)(A),(B).

In conjunction with this, half of the funds that HAVA allocated were for specific payments to each eligible state and unit of local government for:

(1) making polling places, including the path of travel, entrances, exits, and voting areas of each polling facility, accessible to individuals with disabilities, including the blind and visually impaired, in a manner that provides the same

opportunity for access and participation (including privacy and independence) as for other voters; and

(2) providing individuals with disabilities ... with information about the accessibility of polling places ... and training election officials, poll workers, and election volunteers on how best to promote the access and participation of individuals with disabilities in elections for Federal office.

42 U.S.C. § 15421(b).

The Commonwealth Court did not take into account a primary goal of HAVA, which was to increase access at the polls for the disabled. It failed to do so, despite the fact that HAVA allocated fifty-percent of its funds to accomplishing that purpose and despite the Act's repeated references to the need to increase access for disabled voters. To the contrary, the Commonwealth Court injunction would prevent the Secretary from meeting the Section 301 requirement of providing at least one EVS at each polling system in time for the Spring Primary Election. The Electors themselves conceded that each polling place must have one EVS in order to achieve the accessibility requirements of HAVA. *See* Brief of Appellees at 7 ("Petitioners join the Respondents in asking this Court to modify Judge Pellegrini's ruling to the extent necessary to provide accessible voting systems to persons with disabilities consistent with the statutory construct of HAVA.").[28]

---

**28.** In a letter dated February 22, 2006, Pennsylvania Protection and Advocacy and the Disability Voter Coalition of Pennsylvania, *amici* in this case, advised that:

> reliance on federal pre-emption law is misplaced as the sole basis for establishing the authority of county officials to purchase one accessible machine per precinct.
>
> Instead ... County officials have the authority to take this limited action (of placing one accessible voting machine per precinct), as a reasonable accommodation to voters with disabilities. Title II of The Americans with Disabilities Act provides county officials with broad authority to remedy barriers to the full participation of individuals with disabilities and to see that voters with disabilities have an equally effective opportunity to participate in or benefit from elections held by the County.

Although we take note of this argument, we do not reach its merits because of our disposition on the grounds of federal preemption.

The Commonwealth Court agreed with the argument of the Electors that "HAVA applies only to elections for federal office, and does not otherwise seek to affect the administration of elections within Pennsylvania or override Pennsylvania law." Brief of Appellees at 2–3. From their perspective, it would appear that the accessibility requirements of HAVA relate only to elections for federal office, and not to voting for state and local office. With the exception of the one EVS that is required at each polling place for disabled individuals in voting for federal office, those same disabled voters, when casting votes for state and local elections, would have to use the lever machines, which do not meet the requirements for providing access that the EVS unit does.[29]

We note the absence of any evidence establishing that disabled voters in state and local elections would have the access contemplated by HAVA in voting for these offices. The Electors argue that, until there is a referendum approving the replacement of the lever voting machines with the EVS, this outcome is required. We disagree.

The Act is described as "the most comprehensive packing of voting reforms since the enactment of the Voting Rights Act of 1965." 148 CONG. REC. H7841 (daily ed. Oct. 10, 2002) (letter of Protection and Advocacy Systems to Sen. Dodd). It was referred to as "the civil rights bill of the new millennium." *Id.* at H7846 (testimony of Rep. Johnson). Avoiding future disenfranchisement of citizens was a key impetus to the passage of HAVA.

The legislative history is replete with references to the large number of citizens who were disenfranchised during the 2000 elections; it is estimated that the votes of four to six million Americans went uncounted. *Id.* at H7841 (statement on behalf of the Federal Election Commission). Forty-seven percent of the disabled voters encountered physical barriers at the polling place. *Id.* at 7843–44 (testimony of Rep. Conyers).

---

**29.** This outcome, where disabled voters would lack access with respect to voting for state and local offices, appears to contribute to the "holes in our democracy" to which HAVA is intended to respond. *See* 148 CONG. REC. H7845 (daily ed. Oct. 10, 2002) (statement of Rep. Fattah).

The goal of HAVA is to ensure "everyone's right and access to a vote." *Id.* at 7852 (statement of Rep. Jones).

While HAVA addresses requirements for federal elections, its proponents stressed that "[v]oters should never be disenfranchised because of any sort of disability...." *Id.* at H7853 (statement of Rep. McCarthy). Testimony before the Senate established the draconian impact on the voting rights of the disabled that a lack of access causes:

> [the] disabled accessibility standard .... is perhaps one of the most important provisions .... ten million blind voters did not **vote** in the 2000 elections in part because they cannot read the ballots used in their jurisdiction.
>
> * * *
>
> [O]ur nation has a crisis of access to the polling places. Twenty-one million Americans with disabilities did not **vote** in the last election—the single largest demographic groups of non-voters.
>
> [T]hese voting systems are not just for the use of the disabled.... Obviously, anyone in the polling place can use the system.

148 CONG. REC. S2533 (daily ed. April 11, 2002) (statement of Sen. Dodd) (internal citations omitted). Clearly, Congress intended that the voting systems provided under Section 301(a)(3) be accessible to all voters, and the Commonwealth Court erred by enjoining the purchase of EVS that would help achieve the HAVA goal of fostering access for the disabled.

> According to the GAO, approximately 12 percent of registered voters nationwide used DREs in the last Federal election. Obviously, anyone in the polling place can use the system. But these machines can be manipulated by not only the blind and vision-impaired, but by paraplegic and other individuals with motor skill disabilities.

*Id.*

Were we to uphold the Commonwealth Court Order, disabled individuals would not be able to use an EVS to vote in the Spring Primary Election, even in the elections for federal office. Clearly, this directly violates HAVA, which requires

the Board of Elections to make available at least one voting machine or device in each polling place for use by voters with disabilities. 42 U.S.C. § 15481(a)(3)(B). If we merely modified the scope of the injunction by ordering that EVS be used for only disabled voters in federal elections, those same voters would lack access to vote for state and local offices because the lever machines do not provide access.

### (ii.) Replacing Lever Machines is a Primary Goal of HAVA.

Section 301 mandates, *inter alia,* that the voting system, whether paper ballot, punch card, or central count system, have a manual audit capacity.[30] It is undisputed that the lever machine voting system in Westmoreland County does not comply with the manual audit capacity requirement of Section 301 of HAVA.

While the specific methods of complying with HAVA are left to the discretion of each state, the deadline for the replacement of the lever and punch card voting systems is the first election for federal office held after January 1, 2006, which for Westmoreland County is the Spring Primary Election. 42 U.S.C. § 15302(a)(3)(B).

In order to effectuate the installation of a HAVA-compliant voting system, the federal government provided funding to each state, 42 U.S.C. § 15302(a)(1), with provisions for repayment of the funds if the state does not meet the deadline for replacement of the voting machines.

The centrality in the HAVA legislation of replacing lever machines is incontrovertible, given that half of the $650,000,000.00 appropriated pursuant to that Act was dedicated to achieving that goal. 42 U.S.C. § 15304(a). These payments to the states are to be used specifically "to replace ... lever voting systems" in elections for federal offices. 42 U.S.C. § 15302(a)(2).

---

**30.** "The voting system shall produce a permanent paper record with a manual audit capacity for such system." 42 U.S.C. § 15481(a)(2)(A).

When Westmoreland County accepted the funds from HAVA, it did so in order to "replace" its lever voting machines. In its usual and ordinary context, the word "replace" means to "take the place of . . . serve as a substitute for or successor of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1925 (1986).

The statute repeatedly uses the word "replace" with respect to the acceptance of funds regarding noncompliant lever machines. *See, e.g.,* 42 U.S.C. § 15302(a)(3)(A) ("[A] state receiving a payment . . . shall ensure that all of the . . . lever voting systems . . . have been replaced. . . ."); 42 U.S.C. § 15302(b)(1)(A) (providing that the State must certify that it will use the funds to "replace" lever voting machines). Testimony of Rep. Price regarding the Conference Report on H.R. 3295 (Help America Vote Act of 2002), noted that HAVA "incorporates key elements of . . . the Voting Improvement Act, H.R. 775, **to buy out unreliable and outdated punch card machines,**[31] **the type of equipment that has the highest error rate.**" 148 CONG. REC. H7846 (daily ed. Oct. 10, 2002) (statement of Rep. Price) (emphasis added).

Clearly, HAVA requires Westmoreland County to "replace" the lever machines with the EVS that does not use punch cards or levers, allowing the logical assumption that the machines are not to be used. It is reasonable to question whether the goal of "replacement" of noncompliant lever machines is accomplished if those machines are still used in voting for state and local offices, when those elections are conducted simultaneously with the federal elections.

▇▇ Our examination of the legislative history of HAVA leads us to conclude that this goal of the federal legislation is not met by the scheme created by the Commonwealth Court Order, which "replaces" the lever machines with paper ballots for federal offices and allows the use of the lever machines for voting in state and local offices.

---

**31.** Section 102 of HAVA provides for funding to buy out not only lever voting machines but also punch card machines. 42 U.S.C. § 15302(a)(2).

The rationale behind HAVA is to improve the administration and efficacy of federal elections through use of technology that is superior to defunct methods of voting. Brief of Appellant at 41–42 citing H.R. REP. 107–329(I), 107th Cong., 1st Sess. 2001, at 40, 2001 WL 1579545 ("The bill will ensure that as jurisdictions scrap obsolete voting systems, they replace them with systems that have the capability to detect errors, for poll site voting. . . ."). Continued use of lever machines, which represent the machines with the highest error rate, is inconsistent with the goal of improving the election system of this country.

Pursuant to HAVA, "[t]he specific choices on the methods of complying with the requirements of this subchapter ["Uniform and Nondiscriminatory Election Technology and Administration Requirements"] shall be left to the discretion of the State." 42 U.S.C. § 15485. Further, Congress recognized that "[b]y necessity, elections must occur at the State and local level. . . . States and locales must retain the power and flexibility to tailor solutions to their own unique problems." 148 CONG. REC. H7838 (daily ed. Oct. 10, 2002) (statement of Rep. Ney). Nothing indicates that the "State" can contradict the requirements of HAVA. In describing the proposed legislation, Senator Dodd stated that:

> Congress has constitutional authority over both congressional and Presidential elections. This report concludes that there is a role for both the State and Federal Government. **States are responsible for the administration of Federal, State and local elections. But, notwithstanding the traditional State role in elections, Congress has the authority to affect the administration of elections in certain ways.**

148 CONG. REC. S2541 (daily ed. April 11, 2002) (statement of Senator Dodd) (emphasis added).

HAVA also provides that the requirements regarding voting system standards are "minimum" ones, and that the States may establish "election technology and administration requirements that are more strict than the requirements" set forth in HAVA. 42 U.S.C. § 15484.

Pursuant to Section 15485, State election officials in Pennsylvania have concluded that "**HAVA requires the replacement of lever voting machines,**" RR at 326a, and that the EVS units must be used in elections for both state and local offices. The Department further determined that

> **HAVA preempts the Pennsylvania constitutional and statutory provisions that require approval of a referendum before a county uses an electronic voting system. Pennsylvania law is preempted because it presents an obstacle to the accomplishment and execution of Congress' command to replace lever voting machines.** It is the opinion of this office that a county could not rationally justify adopting a new voting system for federal elections while using another system for state elections. **Maintaining two voting systems would cause voter confusion and perpetuate a system that is less reliable in the conduct of an accurate and verifiable recount.** Therefore, based on principles of federal preemption and equal protection, this office believes that counties with lever voting machines cannot and should not place a referendum on their ballots to purchase new electronic voting systems.

HAVA Bulletin # 1, RR at 326a–27a (emphasis added). Congress itself anticipated that HAVA "will cause States and localities to fundamentally restructure their election systems in a host of tremendous ways. We need to provide the funding to make sure that happens." 148 CONG. REC. H7838 (daily ed. Oct. 10, 2002) (statement of Rep. Ney).

We afford great deference to the testimony of the State's election officials regarding the chaos that would ensue at the Spring Primary Election, should the dual system created by the Commonwealth Court be implemented. "[A] reviewing court will ordinarily defer to an agency's interpretation of a regulation or a statute it is charged to enforce." *RAG Cumberland Res. LP v. Dep't of Envtl. Protection*, 869 A.2d 1065, 1072 n. 11 (Pa.Cmwlth.2005).

▮ We have held that:

when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation.... Thus, our courts will not disturb administrative discretion in interpreting legislation within an agency's own sphere of expertise absent fraud, bad faith, abuse of discretion or clearly arbitrary action.

*Winslow–Quattlebaum v. Maryland Ins. Group,* 561 Pa. 629, 752 A.2d 878, 881 (2000). The State election officials interpreted the Election Code as setting forth a unitary system of voting. It is within the purview of this Court to determine the legal question of whether HAVA preempts the Pennsylvania referendum requirement. However, in determining whether the referendum poses an obstacle to the federal legislation, we accord deference to the uncontroverted testimony of the State election officials regarding the harm to voters that would arise out of a dual system of voting at the Spring Primary Election. This is appropriate because the Secretary is empowered by the Election Code and is the "chief State election official of the Commonwealth as defined by [HAVA]." RR at 137a.

Accordingly, the Department concluded that based on the criterion set forth in *Orson, Inc. v. Miramax Film Corp.,* 189 F.3d 377, 381–82 (3d Cir.1999), *cert. denied,* 529 U.S. 1012, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000), holding a referendum would constitute an obstacle to the achievement of the federal goal of replacing the lever machines. We find that this determination is supported, as well, by the testimony at the hearing regarding the drastic effect that a dual voting system would cause, along with the dire impact of losing the federal funds to procure the EVS subsequent to a referendum.

In performing the required examination of HAVA in its entirety, "identifying its purpose and intended effects," *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), we have reviewed its legislative history, which makes it clear that requiring a referendum prior to obtaining the HAVA-compliant machines would controvert the intention of the statute. One of the purposes of

HAVA was to remedy situations that included "confusing ballots; outdated and unreliable voting machines; poll workers who were unable to assist voters who needed assistance because they were overwhelmed or undertrained, or both ..." 148 Cong. Rec. S2527 (daily ed. April 11, 2002) (statement of Sen. Daschle). In the matter before us, the unrebutted testimony established that the use of a dual system of voting in the Spring Primary Election would result in this exact scenario, making it harder for electors to vote because of the confusion that it would cause. *See* RR 732a. This is contrary to the purpose of HAVA, which was intended "to make it easier to vote." 148 Cong. Rec. H7850 (daily ed. Oct. 10, 2002) (statement of Rep. Hoyer). To ensure that its purposes would be achieved, HAVA provided federal funding to "to buy out antiquated voting machines ..." *Id.* at H7852 (statement of Rep. Boehlert).[32]

Based on our Election Code, which prescribes a unitary system of voting, and the federal mandate to replace lever voter machines with EVS units for federal elections, we uphold the decision of the Secretary that when the EVS is installed at the polling places in Pennsylvania, voters in elections for state and local office must use these HAVA-compliant machines. In our view, to do otherwise would be to deny access for the disabled. A referendum requiring approval of a change that is mandated by the federal government to insure the most fundamental right to vote constitutes an obstacle to the accomplishment of the federal legislation and, as such, is preempted.

We agree with the position of Appellants that even if it were possible to conduct a referendum before the Spring Primary Election, which it is not, requiring the citizens of Westmore-

---

32. Rep. Ney cited a study that showed that "18 percent of Americans **vote** using technology that prevailed around the time Thomas Edison invented the light bulb, and nearly 33 percent of Americans **vote** by punching out chads, a system implemented during the Johnson administration." 148 cong rec. H7852 (daily ed. Oct. 10, 2002) (statement of Rep. Ney). Rep. Ney indicated that the use of such antiquated voting mechanisms continued "because of the exorbitant cost to replace them." *Id.*

land County to approve what is required already by Section 301(a) would serve no useful purpose and would, instead, merely "interfere[ ] with the methods by which [HAVA] was designed to reach" the congressional goals of the Act. *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

Further, we find that the Commonwealth Court's suggestion that paper ballots can be used to achieve compliance with HAVA is in error because it also creates an obstacle to the accomplishment of the goals of the federal legislation. While the Election Code provides that where the use of voting machines is "not possible or practicable," a "county election board may arrange to have the voting ... conducted by paper ballots," 25 P.S. § 3016, the use of the word "may" indicates that that section is a permissive grant of authority to the board. The election officials testified as to the chaos that the use of paper ballots would cause, including raising issues of accuracy with respect to both casting and counting of votes, and creating demands on untrained poll workers. RR at 734a–37a. It cannot be disputed that to affirm the use of such a voting mechanism would be contrary to one of the underlying purposes of HAVA, namely to improve the administration of federal elections. *See* 42 U.S.C. § 15301(b)(1)(B) ("A State shall use the funds provided [under HAVA] to carry out ... [i]mproving the administration of elections for Federal office.").

The Commonwealth Court erred by concluding that since it was not "impossible to comply" with both HAVA and the referendum requirement, the doctrine of conflict preemption did not apply. Few things in actuality are "impossible," and, perhaps, there are some blind or disabled voters who managed to vote on lever machines and were not among the ten million blind voters who did not vote in the 2000 election. However, the court erred in applying this standard, rather than determining the practical effect of the state referendum law on the objective and purpose of the federal law.

It is difficult for this Court to imagine a more complicated or detrimental voting system than the one that would result from affirming the Commonwealth Court Order. HAVA contemplates that the states would have flexibility in meeting federally mandated standards, and election officials in Pennsylvania have spoken and made an appropriate determination that the chaos engendered by a dual system of voting warrants a finding that HAVA preempts the state referendum requirement. Neither our Election Code nor HAVA contemplates such a dual election scheme, which would be rife with voter confusion, would deny access to voters with disabilities, and would lead to the disenfranchisement of electors. The record contains no support for any conclusion other than that; the Electors presented no testimony or evidence to rebut the fact that voter bewilderment, voting irregularities, and hampering of federal election administration would result from the dual system. Accordingly, the determination of the Secretary that a referendum is not required is correct, as the conduct of such would act as an obstacle to the underlying goals of HAVA.

## B. The Commonwealth Court Erred with Respect to the Determination of Harm.

While it is not necessary to establish irreparable or immediate harm in order to meet the criteria for a permanent injunction, it was incumbent on Electors to establish that "greater injury will result from refusing rather than granting the relief requested." *Yount v. Pa. Dep't of Corr.*, 886 A.2d 1163, 1167 (Pa.Cmwlth.2005) (quoting *Harding v. Stickman*, 823 A.2d 1110, 1111 (Pa.Cmwlth.2003)). In analyzing harm, the Commonwealth Court stated that:

[e]ven if the Pennsylvania Constitution and the Election Code are not preempted and a vote of the Electors is required, the Board of Elections and the Secretary contend, nonetheless, that a permanent injunction should not be granted because more harm would come from granting the injunction than refusing it.

The harm they allege is that they have already received federal funding for the purchase of the electronic voting system and they may lose that funding if they do not purchase electronic voting machines for use in the 2006 May primary.

They also argue that **if they cannot change Westmoreland County's voting machines, it would be burdensome on election officials, cause added expense and cause some confusion on the part of the voters, either to have paper ballots or separate elections machines for state elections, while having to maintain the current system.** While there may be some confusion among voters and additional costs certainly will be imposed, what those arguments ignore is that the Pennsylvania Constitution and the Election Code require a referendum.

**As to voter confusion, while some may occur, that confusion can largely be ameliorated by voting district election workers explaining the different voting systems.**

\* \* \* \*

.... **The citizens of the Commonwealth, when adopting Article VII, Section 6 of the Pennsylvania Constitution, thought that the manner and counting of voting was so important that it had to be adopted with the consent of the voters so that confidence in the outcome of state and local elections and in state and local democracies would be maintained.**

**Because nothing justifies non-compliance with the express mandates of the Pennsylvania Constitution, as implemented by the election laws of this Commonwealth, allowing the violation of the Pennsylvania Constitution and the Election Code would cause the Electors to be harmed by refusing them their fundamental right to vote on an issue designated to go to vote by the General Assembly.**

Commonwealth Court Opinion at 25–26 (emphasis added) (paragraphs reformatted).

We find this rationale to be neither compelling nor supported by the evidence of record. The Secretary notes that "[p]ursuant to section 102(d) of HAVA, if Westmoreland County should fail to replace its lever voting machines in time for the May 16, 2006 General Primary Election, the Commonwealth would be obligated to return this amount to the [Election Assistance Commission]." Pre–Hearing Memorandum of Law of Pedro A. Cortés, Secretary of the Commonwealth, in Opposition to Petitioners' Action for Declaratory Judgment and in Equity (Secretary's Pre–Hearing Memorandum), RR at 115a.[33] The Electors provided no testimony at the hearing and offered nothing to rebut that allegation of harm or the provision of HAVA requiring repayment. The Commonwealth Court essentially ignored the very real loss of $976,819.32 in federal funding that Westmoreland County received in order to achieve HAVA compliance. The court, although citing the additional burden on election officials and the added expense of having paper ballots or separate voting machines in state elections, while all the while maintaining the existing system, concluded that "[w]hile there may be ... additional costs ... imposed ... the Pennsylvania Constitution and the Election Code require a referendum." Commonwealth Court Opinion at 25. Although this statement is true, it is equally true that the terms of HAVA require replacement of lever machines in Westmoreland County by May 16, 2006, with the cost of doing so approximating the $976,819.32 in funds granted to the

---

**33.** Section 902(c) of HAVA, relating to audits and repayment of funds, provides that:

Recoupment of funds

If the Comptroller General determines as a result of an audit ... that—

(1) a recipient of funds under this Act is not in compliance with each of the requirements of the program under which the funds are provided; or

(2) an excess payment has been made to the recipient under the program,

the recipient shall pay to the office which made the grant or payment involved a portion of the funds provided which reflects the proportion of the requirements with which the recipient is not in compliance, or the extent to which the payment is in excess, under the program involved.

42 U.S.C. § 15542(c).

County. Pursuant to the Order of the Commonwealth Court, those funds will be lost, and the County will still be required to comply with HAVA, replace the lever machines, and do so at its own cost, with no help from the federal government.[34] The court did not explain why it discounted the likelihood of harm that would arise were Westmoreland County required to return the funding and comply with the dictates of HAVA on its own, with no reimbursement from the federal government.

Further, the individual responsible for election administration at the state level testified regarding the chaos that would arise at the Spring Primary Election were a dual system to be implemented. Because the Electors presented no testimony whatsoever, or rebuttal evidence, the Commonwealth Court's conclusion that "confusion can largely be ameliorated by voting district election workers explaining the different voting systems" is purely speculative.

The record is replete with evidence of the type of harm that election officials anticipated with the use of two different voting systems. Some examples include: (1) "voter confusion and perpetuat[ion of] a system that is less reliable in the conduct of an accurate and verifiable recount" (RR at 666a); (2) "the voter actually hav[ing] to use, learn two different voting systems" (RR at 670a); (3) an increase in the opportunity for error based on the documents that have to be prepared by election officials before the election, the conduct of those officials during election day, and procedures after the closing of the polls, (RR at 671a); (4) the need for "two cards of instructions posted, two specimen ballots" (RR at 673a); (5) doubling of voter education efforts to allow voters to learn to use one system one time and another one at another time, or simultaneously (RR at 674a); (6) the great expense of operating a two-machine system given that maintaining the current system includes costs of $100,000.00 per election to take the machines from the storage place to the polling places,

34. Because it is unnecessary to our resolution of this matter, we do not address the merits of Appellants' argument that their acceptance of HAVA Section 102 funds on the condition that the monies be used to replace lever voting machines preempts the referendum requirement.

$175,000.00 per year to store the machines, and a full-time staff of thirteen technicians and a manager to maintain the equipment year round, plus fifty people on weekends and election day to assist the technicians, (RR at 722a–26a); (7) requiring two separate educational procedures for election officials, for voters, and for poll watchers and candidate representatives at the polls (RR at 705a); (8) the need to purchase twice as many EVS units, which would require the programming of 5600 electronic units, along with the 2800 lever machines (RR at 729a–730a); (9) additional costs incurred in printing separate sample ballots for both systems (*id.*); (10) the need to train election officers on both machines (*id.*); (11) separate tabulation of votes (*id.*); (12) the need to manage the people flow to make sure that when voters exit one machine they enter the other one (RR at 731a); (13) the difficulty in reconciling the number of people who cast votes, where one machine would reflect one number and the other set of voting machines would have a different total number (*id.*); (14) the unequal treatment of a blind voter who would vote on the EVS for federal office and then would have to use a lever machine, with assistance, to cast his or her vote in the state and local elections (RR at 731a–732a); (15) the need to print at least a million ballots if the paper ballot system is used (RR at 735a); (16) the need to buy ballot boxes (*id.*); (17) the fact that manually counting the paper ballots is "fraught with error" (*id.*); and (19) poll worker confusion (RR at 738a).[35]

We afford great deference to this testimony. *RAG Cumberland Res. LP v. Dep't of Envtl. Protection*, 869 A.2d 1065, 1072 n. 11 (Pa.Cmwlth.2005) (internal citations omitted). The evidence that some polling places would not be able to accommodate two voting machines and four EVS units because of a lack of available public buildings (RR at 730a) aptly illustrates the harm occasioned by the dual system engineered by the

35. Wolosik testified that "[i]n my experience from working at a regional center taking returns, the election officers forget the difference between a primary and a general." RR at 738a. Wolosik further stated that "even the slight changes [between a primary and a general election] create a certain proportion of mistakes that are made on election night." *Id.*

Commonwealth Court, for the Election Code describes a "polling place" as "the **room** provided in each election district for voting at a primary or election." 25 P.S. § 2602(q) (emphasis added). Because of the shortage of public buildings, some polling places are located in a room of a home or in a garage.[36]

Judge Pellegrini acknowledged but did not credit that "this whole testimony [on behalf of Appellants] is to show that it would be an enormous amount of harm if the [Electors] were successful." RR at 744a. We find that the Appellants did make a convincing case for such harm. Because there was no evidence to the contrary, the Commonwealth Court's finding that "greater injury will result from refusing rather than granting the relief requested," *Yount v. Pa. Dep't of Corr.*, 886 A.2d 1163, 1167 (Pa.Cmwlth.2005), is unsupported and constitutes legal error.

## CONCLUSION

We do not dismiss the value, as acknowledged by the Commonwealth Court, of the right of voters to choose the type of machine to be used in voting. Nevertheless, the Order of the Commonwealth Court would cause harm and chaos to the actual voting process in the Spring Primary Election, to the direct detriment of the goals expressed in HAVA. Requiring a dual system of voting because no referendum was conducted would result in an election replete with problems involving casting and counting votes and would limit access to those with disabilities, all of which impede the implementation of HAVA. Therefore, principles of conflict preemption apply, and the state referendum requirement must yield to the federal law.

Our holding is consistent with the intent of the federal legislation, which does not impose upon the states the particular voting system they should use. Instead, pursuant to HAVA, that choice is left to each state. In the matter *sub*

36. We are hard-pressed to imagine how a polling place that is located in someone's living room or garage could accommodate a dual system of voting, using a lever machine along with paper ballots and/or an EVS unit.

*judice,* Westmoreland County election officials chose to replace lever machines with EVS units for use in not only federal, but also state and local elections. State election officials made that decision on the basis of the Election Code's establishment of a unitary system of voting and the harm to the election process that would occur with a dual system of voting. Because it is within the purview of the Secretary to determine that the use of a dual system of voting would be injurious to the conduct of the Spring Primary Election and would lead to the disenfranchisement of voters, we accord deference to that decision.

The right of electors, through a referendum, to select the type of voting machines does not take precedence over the critical need to ensure that in the Spring Primary Election, voters are not disenfranchised by a dual system of voting not contemplated by our Election Code. HAVA requires replacement of lever machines for elections for federal office, and the Secretary has determined that our unitary system of voting demands that voting for state and local elections take place on the federally compliant EVS, as well. A requirement to hold a referendum, prior to allowing the purchase of the EVS units, would be one that emphasizes form over substance and that would directly impede the goals of the HAVA legislation, including accessibility for disabled voters and improved accuracy regarding casting, counting, and tallying votes.

Accordingly, we vacate the grant of the permanent injunction and reverse the determination of the Commonwealth Court. The Electors did not establish the criteria necessary for the equitable relief granted, and HAVA preempts the state referendum requirement in this case. The Commonwealth Court, in limiting its analysis to the replacement of lever voting units with EVS, failed to consider many other equally important sections of HAVA that require that the voting system selected ensures greater accessibility at the polls to voters with disabilities. We cannot countenance a dual system of voting that, while arguably not "physically impossible," impedes election administration and frustrates voter access at the Spring Primary Election. Given the instant circum-

stances, the requirement of a voter referendum to approve a system that is required by federal law would constitute an act "full of sound and fury, signifying nothing." [37]

Chief Justice CAPPY and Justices SAYLOR and BAER join the opinion.

Justice CASTILLE files a concurring opinion in which Justices EAKIN and BALDWIN join.

Justice CASTILLE concurring.

I agree that the Help America Vote Act, 42 U.S.C. §§ 15301–15545, preempts the referendum requirement in the Pennsylvania Election Code, Section 1102, 25 P.S. § 3002, and therefore I concur in the result of the Majority Opinion.

Justice EAKIN and Justice BALDWIN join this opinion.

---

**37.** William Shakespeare, *The Tragedy of Macbeth,* Scene V.