Department of Licenses and Inspections, Appellant, v. Weber.

467

Argued November 21, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

*David Berger,* City Solicitor, with him *James L. J. Pié, Albert J. Persichetti,* Assistant City Solicitors, *Alan Miles Ruben,* Assistant to the City Solicitor, and *James L. Stern,* Deputy City Solicitor, for appellant.

*Isadore Gottlieb,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 12, 1959:

Nancy Weber owns a beauty shop in Philadelphia and holds a license issued by the State Board of Cosmetology, authorizing her to carry on the work of enhanc-

ing the feminine pulchritude of the land.   On July 24,
1957, she was notified, through appropriate agencies
of the City of Philadelphia that, according to provi-
sions of the City's Health Code (Sections 6-402(3) and
6-503), she was required to obtain a city license and
introduce certain features into her shop so that it
would meet standards of safety and sanitation set up
by the City.

She refused to apply for the city license and de-
clined to carry out the recommendations of the Depart-
ment, asserting that she was amenable only to the pro-
visions of the Beauty Culture Act of May 3, 1933, P. L.
242, 63 PS §507, under whose aegis she was operating,
by virtue of the State license already issued to her. Ac-
cordingly she appealed to the Board of License and In-
spection Review, claiming that "Sections 6-402, para-
graphs 3a to 3h inclusive and section 6-503 of the Code
of General Ordinances of the City of Philadelphia and
Regulations promulgated thereunder for governing of
Beauty Shops and Schools of Beauty Culture are in-
valid, illegal, and unconstitutional and therefore unen-
forceable." The Board rejected her contentions and
she appealed to the Court of Common Pleas No. 7 of
Philadelphia County which reversed the adjudication
of the Board.

The common pleas court held generally that,
through the instrumentality of the Act of 1933, the
State had preempted the field of beauty culture regu-
lation, and that no municipality, therefore, could step
into that area of supervision and control.   Of course,
it is obvious that where a statute specifically declares
it has planted the flag of preemption in a field, all
ordinances on the subject die away as if they did not
exist.   It is also apparent that, even if the statute is
silent on supersession, but proclaims a course of regu-
lation and control which brooks no municipal inter-

vention, all ordinances touching the topic of exclusive control fade away into the limbo of "innocuous desuetude." However, where the Act is silent as to monopolistic domination and a municipal ordinance provides for a localized procedure which furthers the salutary scope of the Act, the ordinance is welcomed as an ally, bringing reinforcements into the field of attainment of the statute's objectives.

The lower court does not dispute these fundamental observations but avoids their application to the case at bar by a circuitous reasoning which begins with an erroneous concept and necessarily arrives at a fallacious conclusion. Thus, in the silence of the Beauty Culture Act as to municipal supplementation, the court sees prohibition of municipal regulation. It says: "We can perceive this intent in the very silence of the Assembly on this question. There is nothing in the Act which we can point to as indicating what the Assembly intended as to local action. This silence is important. In a similar, companion statute regulating Barber Shops, the Assembly said: 'Nothing contained in this Act . . . shall be construed as prohibiting any municipality from adopting appropriate ordinances not inconsistent with the provisions of this Act . . .': Act of June 19, 1931, P. L. 589; 63 P.S. 566. Certainly, if the Assembly in drafting the 'Barber' Act spoke out clearly that it welcomed concurrent local action, its very silence in the 'Beauty Culture' Act evidences the Assembly's intention to prevent such action." But the Barber Act of 1931 did not, as the lower court mistakenly maintains, state that municipal supplementation was not prohibited. It was an *amendment* to that Act (passed in 1935) which added this explanatory provision. And the reason for the explanation was that a court of common pleas in Delaware County had ruled that an ordinance of the City of Chester which required

city registration of barbers was ineffective due to the state-wide regulation provided by the Barber Law of 1931. (*Chester v. Chouch,* 19 D. & C. 457) To disavow the assumption of State monopoly of barber shop regulation, the Legislature passed the law of May 9, 1935, which specifically announced: "Nothing contained in this act, or *the act to which this is an amendment,* shall be construed as prohibiting any municipality from adopting appropriate ordinances, not inconsistent with the provisions of this act or the rules and regulations adopted thereunder, as may be deemed necessary to promote the public health and safety and regulate the conduct of barber shops and schools . . ." (Act of May 9, 1935, P. L. 158, §2) (Emphasis supplied).

Thus, the Act of 1935 was but a reiteration of the legislative intent pronounced in 1931, namely, that by silence the intention was made clear that local regulation was not only not prohibited but, where necessary, invited.

The Beauty Culture Act, by a similar silence, mutely spoke the same invitation. The Barber License Law and the Beauty Culture Law are in effect legislative Siamese twins. It is true they were born two years apart, but in the life of a commonwealth, and certainly in the life of the general welfare of a people, two years may be but a moment. The kinship between these two creatures of the Legislature was recognized in the Beauty Culture Act by the language: "Nothing in this [Beauty Culture] act is intended to be inconsistent with the [Barber] act . . ." (Act of May 3, 1933, P. L. 242, §17, 63 P.S. §523.)

It is a cardinal rule of statutory construction that a statute must never be read, unless the text impels so extraordinary a reading, as to impart to it an absurd intent. With this rule in mind the question naturally follows, (if the lower Court's interpretation is correct),

as to why the Legislature would nail down tightly the state tent of beauty culture regulation, but leave it open in barber shop regulation.' Why would the Legislature say that a city health agent might look into a barber shop to make certain that no rodents were gnawing at the chairs but that a similar agent could not inspect the permanent wave machines in a beauty shop to make certain they did not endanger the heads of the ladies who were to sit under them?

· The Barber License Law and the Beauty Control Act have but one purpose, and that is the protection of patrons of barber and beauty shops. Prior to the enactment of the Barber License Law, any man could go into business as a barber, even if his lack of training for the vocation was exceeded only by his lack of knowledge and respect for hygiene. There was no way to prevent an epileptic barber from wielding a rusty razor over the throat of his helpless customer. What the Legislature placed in the Barber License Act in 1931 was not the maximum of regulation which would save prisoners of the barber chair from maladroit and mangy hands, but a level of regulation and control, below which no municipality would be permitted to go. Whatever additional protection cities, boroughs and townships wished to provide for barber shop patrons would be a boon and not a detriment to public welfare.

The Legislature could not be expected to itemize the last towel and drop of antiseptic which, for sanitation and cleanliness, would be required in every barber and beauty shop in the State. The size of the municipality, congestion of population, geography of locale, weather and climate prevailing in the area could have a very decided bearing on the extent of the meticulousness of the sanitary supervision required in any particular group of shops. It would not be unnatural to assume that regulations could be stricter and more rigid in

large cities where the turnover in clientele would be comparatively rapid as against a village or small rural center where the customers are known by their first name, occupation and frequency of visit. ". . . the preservation of the health, safety, welfare, and comfort of dwellers in urban centers of population requires the enforcement of very different, and usually much more stringent, police regulations . . . than are necessary in a state taken as a whole. Different police regulations may also be required in different municipalities, depending on the density of the population." (37 Am. Jur., Municipal Corporations, §276 at 898-899)

Thus the matter of detailed supervision and control was left to the municipalities which, of course, were bound to follow the broad outlines of the mother legislation but not restricted to any inflexible delineation of control in imposing health regulations.

The question before us in the case at bar was thoroughly considered and rather definitively decided in the case of *Western Pennsylvania Restaurant Association v. Pittsburgh,* 366 Pa. 374. In 1945 the Pennsylvania Legislature passed a law (May 23, 1945, P. L. 926) "For the protection of the public health by regulating the conduct and operation of public eating and drinking places within this Commonwealth; requiring their licensing; imposing certain duties on the Department of Health of this Commonwealth and on the local health authorities; and providing penalties." On September 8, 1948, the City of Pittsburgh enacted an ordinance which covered substantially the same ground and aimed at the same objectives as the statute. The Western Pennsylvania Restaurant Association brought a bill of complaint to have the city's ordinance declared illegal and void on the ground that the State had preempted the field and that some of the provisions of the ordinance were inconsistent with those of the statute.

Our Court upheld the legality of the ordinance. In a very able and exceedingly well reasoned opinion, Justice STERN (later Chief Justice) said that the statute did not preempt the field of legislation regarding the regulation of public eating and drinking places. Further, the statute provided that licenses were not to be issued until inspection of the premises established that the facilities and equipment were found to be "not merely in conformity with the requirements of the State statute—but 'adequate to the protection of the public health and comfort of patrons' thus apparently allowing a wider range of discretion on the part of the local licensing body. Moreover it is obvious, even in the absence of express testimony to that effect, that the sanitary standards and appropriate regulations in the case of restaurants in a large city such as Pittsburgh might well be, and no doubt are, quite different from those applicable to rural communities, in view, among other conditions of the usually larger numbers of patrons and the congestion of buildings with consequent special problems of their construction and ventilation."

If, in reading this decision, we substitute the concept of a beauty shop for that of a restaurant, insofar as sanitation and health requirements are concerned, we could practically conclude that the *Western Pennsylvania Restaurant* case is *stare decisis* for the litigation at hand.

In that case we approved of what was said in a California case, namely: "A municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable." (*Natural Milk Producers Association v. City and County of San Fran-*

*cisco,* 20 Cal. 2d 101, 109)

Modern science has not only monumentally increased the velocity with which physical objects may pass through the air, but it has devised methods of detecting celerity with which germs travel and operate. Hand in hand with the development of jet propulsion has come the realization that disease organisms may spread from mere skin contact and that a source of contagion may disable large groups of people without physical contact at all. Thus health regulations in large cities may need to change from season to season or even week to week, depending on local conditions and crises. When epidemics strike, there may not be time to summon legislatures to recruit armies of resistance. Thus, aside from the grant of power which may be implied from the provisions of the Beauty Culture Act, the City of Philadelphia, under the Home Rule Charter of 1951, is armed with police power to cope with problems of health. (*Warren v. Philadelphia,* 382 Pa. 380, 384.) Section 5-300(a) of the Charter provides that the City Department of Public Health "shall administer and enforce statutes, ordinances and regulations relating to public health including those dealing with . . . the pursuit of occupations affecting the public health."

The lower court says in its opinion that the city ordinance here involved was "quite obviously modeled after the earlier 'Beauty Culture' Act of Assembly." And that it "adds nothing to it. It offers duplication, not fresh regulation." Apparently the Court below did not compare the broom of the state statute with the broom of the city ordinance. Had it done so, it would have found not only that many of the straws of the statutory broom had been strengthened, but that new ones had been added, all to the end that cleanliness should be served, sanitation enhanced, and health more

certainly preserved. For instance, the state statute prohibits the use of any beauty shop for residential purposes; the municipal regulation goes further and requires a solid partition between the shop and any room used for human habitation. The statute says that floors shall be kept "in a clean and sanitary condition"; the ordinance says they shall be free of cracks and holes and so constructed as to admit of rapid cleansing. The State grounds an operator who is knowingly suffering from a contagious or infectious disease; the City takes time by the forelock and requires operators to submit to annual chest x-ray examinations, also to abstain from narcotics, and not to be under the influence of alcohol while administering treatments. The State says that tools shall be cleaned and sterilized, the City specifies the degree of heat and the content of chemical preparations to be used in the sterilizing process; etc., etc. Moreover, the City has added requirements not included in the State statute. Thus, beauty shops must have certain lighting; they must be unhospitable to insects and rodents by the erection of barriers to their visits; operators must not smoke while serving patrons; equipment must be fireproof and asphyxiation-proof because while the price of beauty is unquestionably high it should not be attained at risk to body and limb.

The Philadelphia ordinance agrees with Keats that "A thing of beauty is a joy for ever," but it believes in making beauty safe, sanitary, and secure. No one should object to that philosophy and no one may object to it under the law as here propounded.

The order of the court below is reversed, the ordinance is sustained, and the adjudication of the City's Board of Licenses and Inspection Review is re-instated.