938 A.2d 401

Michael A. NUTTER

v.

John DOUGHERTY, Dwight Evans, Chaka Fattah,
Jonathan Saidel, and City of Philadelphia

Appeal of Chaka Fattah.

Michael A. Nutter

v.

John Dougherty, Dwight Evans, Chaka Fattah,
Jonathan Saidel, and City of Philadelphia

Appeal of Chaka Fattah.

Michael A. Nutter

v.

John Dougherty, Dwight Evans, Chaka Fattah,
Jonathan Saidel, and City of Philadelphia

Appeal of John Dougherty.

Michael A. Nutter

v.

John Dougherty, Dwight Evans, Chaka
Fattah and Jonathan Saidel

Appeal of John Dougherty.

Michael A. Nutter

v.

John Dougherty, Dwight Evans, Chaka
Fattah and City of Philadelphia

Appeal of John Dougherty.

Supreme Court of Pennsylvania.

Argued Oct. 15, 2007.

Decided Dec. 28, 2007.

343

Jonathan F. Bloom, Stradley, Ronon, Stevens & Young, L.L.P., Philadelphia, for Campaign Legal Center, amicus curiae.

Gregory M. Harvey, Montgomery, McCracken, Walker & Rhoads, L.L.P., Philadelphia, for Chaka Fattah, appellant.

Richard Gerson Feder, Lewis Rosman, City of Philadelphia Law Dept., for City of Philadelphia, appellee.

Susan Laura Burke, Burke O'Neil, L.L.C., for Michael A. Nutter, appellee.

George Bochetto, Bochetto & Lentz, P.C., Philadelphia, for John Dougherty, appellee.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

Justice BAER.

We are called upon to consider whether the General Assembly, in enacting and later amending the Election Code,[1] intended to preempt municipalities from legislating their own regulations limiting campaign contributions to candidates for

---

1. *See* Act of June 3, 1937, Pub.L. 1333, § 1, *as amended*, 25 P.S. §§ 2600, *et seq.*

municipal office.[2] The General Assembly has enacted modest limitations on the manner in which interested individuals, political action committees (PAC), and corporations may contribute to the campaign coffers of candidates for state or local office, and no material limits on the sums that may permissibly be given to candidates. In an effort to stem what has been characterized as a "pay to play" political culture, the Philadelphia City Council enacted an Ordinance in 2003 limiting campaign contributions to candidates for municipal office, and refined it by amendment in the years immediately thereafter. When Appellant Michael Nutter, now Mayor–Elect, filed a complaint in the trial court seeking to enforce the Ordinance against other putative mayoral candidates, those candidates challenged the validity of the Ordinance under state law. The trial court upheld these challenges, ruling that the Pennsylvania Election Code manifests the General Assembly's intent to preempt all local campaign regulation to ensure the uniform elections provided by Article VII, § 6, of the Pennsylvania Constitution.[3] On appeal, the Commonwealth

**2.** Our order granting allowance of appeal limited our review to the following issue:

Whether the Philadelphia Code Chapter 20–1000, *et seq.* ("Campaign Finance Law"), which places limitations on political campaign contributions, is invalid under the Home Rule Act, 53 P.S. § 13133, because it is "contrary to, or in limitation of" the Pennsylvania Election Code where the Election Code already contains comprehensive provisions regulating the permissible size, type and manner of political campaign contributions, but also allows unlimited contributions in most instances?

*Nutter v. Dougherty*, 592 Pa. 8, 922 A.2d 873, 873–74 (2007) (*per curiam*). This question necessarily encompasses questions of preemption.

**3.** All laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State, except that laws regulating and requiring the registration of electors may be enacted to apply to cities only: Provided, That such laws be uniform for the cities of the same class, and except further, that the General Assembly shall, by general law, permit the use of voting machines, or other mechanical devices for registering or recording and computing the vote, at all elections or primaries, in any county, city, borough, incorporated town or township of the Commonwealth, at the option of the electors of such county, city, borough, incorporated town or township, without being obliged to require the use of such voting machines or mechanical devices in any other county, city, borough,

Court reversed, finding in the Election Code insufficient indicia of the legislature's intent to preempt local regulation in the area of campaign contributions, and ruling that Philadelphia was free as a Home Rule municipality[4] to enact campaign regulations governing campaign contributions to candidates for municipal office. *See Nutter v. Dougherty,* 921 A.2d 44 (Pa.Cmwlth.2007). We affirm.

■ Before relating the background of this case, it is necessary to establish, in broad strokes, the principle of state preemption of local lawmaking authority and its several forms. In *Department of Licenses and Inspections, Board of License and Inspection Review v. Weber,* 394 Pa. 466, 147 A.2d 326 (1959), this Court explained two of the three closely related forms of preemption as follows:

> Of course, it is obvious that where a statute specifically declares it has planted the flag of preemption in a field, all ordinances on the subject die away as if they did not exist. It is also apparent that, even if the statute is silent on supersession, but proclaims a course of regulation and control which brooks no municipal intervention, all ordinances touching the topic of exclusive control fade away into the limbo of 'innocuous desuetude.'

*Id.* at 327. In addition to those two forms of preemption, respectively "express" and "field preemption," there is also a third, "conflict preemption," which acts to preempt any local

incorporated town or township, under such regulations with reference thereto as the General Assembly may from time to time prescribe. The General Assembly may, from time to time, prescribe the number and duties of election officers in any political subdivisions of the Commonwealth in which voting machines or other mechanical devices authorized by this section may be used.
PA CONST ART. VII, § 6.

**4.** Article IX, § 2, of the Pennsylvania Constitution, *see infra* n. 9, empowered the General Assembly to authorize Pennsylvania municipalities to enact Home Rule Charters entitling them to manage matters pertaining to municipal governance. The General Assembly so authorized Cities of the First Class, *i.e.,* Philadelphia, *see* Act of April 21, 1949, Pub.L. 665, *as amended,* 53 P.S. §§ 13101, *et seq.,* and soon thereafter Philadelphia enacted its Home Rule Charter pursuant to that authority. *See City of Philadelphia v. Schweiker,* 579 Pa. 591, 858 A.2d 75, 84 & nn. 11, 12 (2004). These topics are taken up in greater detail, *infra.*

law that contradicts or contravenes state law. *See Mars Emergency Med. Servs. v. Township of Adams,* 559 Pa. 309, 740 A.2d 193, 195 (1999) (citing, *inter alia, W. Pennsylvania Rest. Ass'n v. Pittsburgh,* 366 Pa. 374, 77 A.2d 616, 619–620 (1951)) (hereinafter *Mars EMS*). Having established the general import of these principles, we turn to the background of the case.

On December 18, 2003, the Philadelphia City Council passed an ordinance, effective January 1, 2004, establishing a $1000 limit on campaign contributions by "persons" to candidates for Mayor and City Council, and a $5000 limit on contributions by PACs. The Ordinance was amended on June 9, 2005, extending contribution limits to candidates for all other Philadelphia elective offices, and increasing the relevant limits to $2500 for individuals under § 20–1002(1) and $10,000 for non-individuals and PACs.[5] Finally, on November 16, 2006, the Ordinance was once again amended—first, to define "candidate" as "(a) [a]n individual who files nomination papers or petitions for City elective office; [or] (b) [a]n individual who publicly announces his or her candidacy for City elective office;" and second, to provide that, should a candidate contribute $250,000 or more of his own money to his campaign, all limits under the Ordinance would double for all other candidates.[6]

Under these provisions, Appellee Nutter filed a complaint on April 12, 2006, in the Philadelphia County Court of Common Pleas against John Dougherty and Chaka Fattah; Dwight Evans; and Jonathan Saidel [7]—all politicians Nutter maintained were exploring mayoral candidacies.[8] Appellee

5. On December 1, 2005, the Ordinance again was amended, this time to require candidates for local elective office, among others, to file campaign finance reports with the Board of Ethics.

6. Because Appellants challenge Philadelphia's prerogative to enact any meaningful legislation purporting to limit campaign contributions, the particulars of the Ordinance are immaterial to the discussion that follows. The entire Ordinance is reproduced as an Appendix to the Commonwealth Court Opinion. *See Nutter,* 921 A.2d at 63–67.

7. Only John Dougherty and Chaka Fattah appealed to this Court.

8. What follows is an abbreviated account of the procedural history of the instant litigation. A more detailed rendering is provided in Com-

Nutter sought, in Count I, relief under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531, *et seq.*, directing these putative mayoral candidates to abide by the Ordinance's campaign finance limits. In Count II, Appellant Nutter sought an injunction directing the other candidates not to accept illegal contributions and to return any contributions already accepted that failed to pass muster under the Ordinance. Appellant Dougherty, in turned, filed a counterclaim. Therein, Dougherty challenged the constitutionality of the Ordinance, arguing that it was preempted by the Election Code.

After disposing of the preliminary matters addressed *supra* n. 8, the trial court invited the parties to file motions for judgment on the pleadings with respect to the validity of the Ordinance. The parties complied, and on December 13, 2006, the trial court entered an order granting judgment on the pleadings in favor of the named defendants, those mayoral candidates who challenged the Ordinance, based on its determination that the Ordinance contravened the General Assembly's intention to preempt all local ordinances affecting elections except as expressly provided. Because the Election Code contained no express authorization pursuant to which municipalities might impose local campaign finance limitations, Philadelphia lacked authority to enact the Ordinance. Thus, the court ruled the Ordinance invalid.

monwealth Court opinion from which this appeal arises. *See Nutter,* 921 A.2d at 46–49.

The Commonwealth Court discussed at length numerous questions pertaining to the standing of the complainants to bring the instant suit and assertions that the case was rendered moot by some combination of the outcome of the intervening primary (and now general) elections and the effect of Appellee Nutter's failure to resign as a City Councilman prior to announcing his mayoral candidacy. We have dismissed these challenges by *per curiam* order, *see Nutter v. Dougherty,* 5–9 EAP 2007 (Pa. Oct. 4, 2007) (*per curiam*), reflecting our determinations that the parties have standing to litigate the issue in question, and that, given the brevity of election cycles and the amount of time it takes for litigation to reach this Court, the question presented is one capable of repetition and avoiding review, a limited exception to the doctrine of mootness applicable to this case. *See Public Defender's Office of Venango County v. Venango County Court of Common Pleas,* 586 Pa. 317, 893 A.2d 1275, 1279–80 (2006). Only the merits of the underlying question remain, as articulated by our order granting allowance of appeal, *supra* n. 2.

On appeal, the Commonwealth Court reversed. The court began by reviewing Philadelphia's authority as a First Class City under the Home Rule Act. *See* 53 P.S. §§ 13101, *et seq.* (granting, and detailing, the self-government authority of cities of the first class); PA. CONST. ART. IX, § 2.[9] The court cited this Court's decision in *City of Philadelphia v. Schweiker*, 579 Pa. 591, 858 A.2d 75 (2004), for the proposition that "the Home Rule Act granted Philadelphia general authority of local self-government that includes complete powers of legislation and administration in relation to its municipal functions as set forth in" 53 P.S. § 13131. *Nutter*, 921 A.2d at 54. The court also reviewed § 13133 of the Home Rule Act, which provides that, "[n]otwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly" in pertinence to, *inter alia*, "the personal registration of electors." 53 P.S. § 13133(a)(7). Pursuant to the Home Rule Act, the court continued, Philadelphia, on April 17, 1951, adopted its Home Rule Charter granting the city, in terms that echo Article IX, § 2, of the Pennsylvania Constitution, "all powers and authority of local self-government" and "complete powers of legislation and administration in relation to its municipal functions," as well as "the power to enact ordinances and to make rules and regulations necessary and proper for carrying into execution its powers." *Nutter*, 921 A.2d at 55 (quoting Philadelphia Home Rule Charter § 1–100).

Notwithstanding the Home Rule Act's grant of authority, the court noted, any enactment pursuant to that act's authori-

9. PA. CONST. ART. IX, § 2, provides:
Municipalities shall have the right and power to frame and adopt home rule charters. Adoption, amendment or repeal of a home rule charter shall be by referendum. The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. If the General Assembly does not so provide, a home rule charter or a procedure for framing and presenting a home rule charter may be presented to the electors by initiative or by the governing body of the municipality. A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

ty is subject to the doctrine of preemption, which provides, generally, "that when the legislature has preempted a field the state has retained all regulatory and legislative power for itself and therefore prohibits local legislation in that area." *Id.* at 56. Preemption, the court emphasized, is the exception and not the rule. *Id.* (citing *Council of Middletown Township v. Benham*, 514 Pa. 176, 523 A.2d 311, 315 (1987)). The Court observed that preemption does not result simply because the General Assembly legislates in the field; rather, the legislature must manifest its intent entirely to preempt that field. *Id.* (citing *Council of Middletown*, 523 A.2d at 315). In light of these principles, the court determined that the Election Code manifests no express preemptive mandate, nor any implicit mandate sufficiently clear to satisfy the stringent standard articulated in Pennsylvania precedent. Accordingly, the court reversed the trial court's ruling and, in effect, upheld Philadelphia's Ordinance. This appeal followed.

Appellant Dougherty contends that conflict preemption precludes the Ordinance inasmuch as it contravenes the General Assembly's intent. To that end, he directs our attention to our decision in *Cali v. City of Philadelphia*, 406 Pa. 290, 177 A.2d 824 (1962), which he contends made clear that the Election Code is intended fully to occupy the field of campaigns and elections such that any contribution limits not specifically provided therein necessarily and impermissibly conflict with the limitations on local authority provided by the Home Rule Act. *See* 53 P.S. § 13133 ("[N]o city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by the acts of the General Assembly...."). In *Cali*, Dougherty maintains, this Court held that Philadelphia could not hold a special election for Mayor in an even-numbered year where state law provided that the Mayor's office was to be filled only by an election occurring in an odd-numbered year. Analogizing *Cali* to the instant case, Dougherty argues that the Election Code is not entirely silent on campaign contributions, but rather eschews only general limitations, nonetheless imposing certain reporting requirements, limiting cash contributions to $100, and so on. Thus, in keeping with

350

his reading of *Cali*, Dougherty would have us find in the Election Code's silence with respect to contribution limits not a tacit authorization to local municipalities to impose such limits as they see fit, but rather a clear indication that the legislature intended that no such limits should be imposed beyond those modest provisions provided in the Election Code.[10]

Appellant Fattah, who claims that field preemption bars the Ordinance, begins his argument with Article VII, § 6, of the Pennsylvania Constitution, which, he argues, requires "uniformity with respect to the laws that regulate elections." Brief for Appellant Fattah at 8 (quoting *Kuznik v. Westmoreland County Bd. of Comm'rs*, 588 Pa. 95, 902 A.2d 476, 490 (2006); Fattah's emphasis omitted). It was with that constitutional mandate of uniformity in mind, he continues, that the General Assembly enacted the first Election Code in 1937, *see* Act of June 3, 1937, Pub. L. 1333, § 1, *as amended*, 25 P.S. §§ 2600, *et seq.* He argues that subsequent amendments, particularly the 1978 amendments discussed *infra*, only rendered the Code more comprehensive in the decades that followed.

To illustrate the point, Fattah furnishes a lengthy list of election-related matters as to which the General Assembly has enacted broadly applicable guidelines. Turning to the areas of campaign contributions and expenditures, Fattah contends that "the Election Code sets forth a comprehensive regulatory scheme that deals with all aspects of contributions and expenditures," citing two provisions of the Code. Brief for Appellant Fattah at 9 (citing 25 P.S. §§ 3253 (prohibiting campaign donations to candidates for office from most corporations, state and national banks, and partnerships), 3254 [11]). Fattah

10. Although we recount Appellant Dougherty's argument on this point, and below consider Appellees' response to it, upon closer examination, we conclude, *infra*, that the conflict preemption argument emerges as a field preemption argument in slightly different clothing.

11. Section 3254 (Contributions by agents; anonymous contributions; cash contributions) provides:

(a) It shall be unlawful for any person to make any contribution with funds designated or given to him for the purpose by any other person,

avers that the Commonwealth Court ruling, if upheld, will lead to the "balkanization" of the Election Code under which the Commonwealth will become a crazy quilt of disparate local campaign regulations, compromising the universalizing spirit of the Election Code.

Appellant Fattah finds support for his position in aspects of the reenactment of Article XVI of the Election Code in 1978. *See* Act of Oct. 4, 1978, Pub.L. 893, No. 171; 25 P.S. §§ 3241–60. In particular, Fattah contends that the amendatory 1978 enactment adopted the broad definitions of "expenditure" and "contribution" [12] previously enacted by the United States Congress in 1971's Federal Election Campaign Act, 2 U.S.C. §§ 431, *et seq.* Following the 1974 amendments to the federal act, Fattah notes, federal law prohibited individual contribu-

firm or corporation. Each person making a contribution shall do so only in his own name.

(b) It shall be unlawful for any candidate or political committee to disburse money received from an anonymous source. All such money shall be handed over to the State Treasurer within twenty (20) days of its receipt.

(c) It shall be unlawful for any person to make contributions of currency of the United States or currency of any foreign country to or for the benefit of any candidate which in the aggregate, exceed one hundred dollars ($100), with respect to any candidate for election. *See also id.* § 3253 (constraining campaign-related contributions and expenditures by banks, corporations, and unincorporated associations).

12. *Compare* 2 U.S.C. § 431(9)(A)(defining "expenditure" to include, *inter alia*, "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office") *with* 25 P.S. § 3241(d)(defining "expenditure" to include, *inter alia*, "the payment, distribution, loan or advancement of money or any valuable thing by a candidate, political committee or other person for the purpose of influencing the outcome of an election"). Similarly, Appellant Fattah notes the close parallel between the federal and Pennsylvania definitions of "contribution." *Compare* 2 U.S.C. § 431(8)(A)(defining "contribution" to include, *inter alia*, "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office") *with* 25 P.S. § 3241(b) (defining "contribution" to include, *inter alia*, "any payment, gift, subscription, assessment, contract, payment for services, dues, loan, forbearance, advance or deposit of money or any valuable thing, to a candidate or political committee made for the purpose of influencing any election in this Commonwealth or for paying debts incurred by or for a candidate or committee before or after any election").

tions to candidates in excess of $1000, and imposed limitations on cash contributions, measures upheld against constitutional challenge in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Notwithstanding these limitations however, and notwithstanding that the General Assembly adopted the federal definitions more or less wholesale, the legislature declined to adopt the contribution limitations found beside these adopted definitions, evincing, in Fattah's view, the General Assembly's affirmative intention to leave campaign contributions unlimited, *contra* federal law.[13]

Turning to this Court's caselaw, Fattah argues that our holding in *Mars EMS,* 559 Pa. 309, 740 A.2d 193, counsels reversal. In that case, Fattah argues, this Court rejected preemption only where the state law in question expressly mandated, in the context of emergency care, that the Secretary of Health "involve" local citizens in its decision-making when to do so is feasible. Similarly, Fattah contends that this Court rejected preemption, in *Weber,* 394 Pa. 466, 147 A.2d 326, because the act in which preemptive intent putatively lay, the Beauty Culture Act, was to be read *in pari materia* with the complementary Barber Act, which, following amendment, specifically provided that it should not be construed to prohibit local bodies from adopting ordinances consistent with the state act. In this case, by contrast, Fattah argues that no such express provision delegates any questions of campaign finance to municipal authorities. Thus, Fattah concludes, "the General Assembly tacitly but thoroughly intended to preempt the field and create 'uniformity with respect to the laws that regulate elections.'" Brief for Appellant Fattah at 13 (quoting *Kuznik,* 902 A.2d at 490).

Appellees reject Dougherty's "conflict preemption" argument on the basis that nothing in the Ordinance at issue is "contrary to" or "in limitation of" the Election Code. They

13. Fattah also notes that the General Assembly has delegated authority to local jurisdictions in election matters in various provisions of the Election Code, thus further warranting the inference of a contrary intent where, as in this case, the legislature fails to do so. *See, e.g.,* 25 P.S. §§ 2641–42 (granting limited authority to county boards of elections).

note that the applicable standard for determining whether "conflict preemption" applies is strict, permitting such a ruling only when "the conflict between the statute and the ordinance is irreconcilable." Brief for Appellee Philadelphia at 42 (quoting *City Council of the City of Bethlehem v. Marcincin*, 512 Pa. 1, 515 A.2d 1320, 1326 (1986)).[14] That the legislature opted not to impose contribution limits on a state-wide basis, they maintain, in no way manifests an unambiguous legislative intention to recognize, establish, or protect an unlimited right to contribute to candidates in local elections. Appellees reject the notion that silence amounts to the establishment of all rights implicated by that silence, observing that, "[i]f state silence were sufficient to create a conflict, then every preemption challenge to local legislation would succeed, because in every case the locality would be regulating conduct the General Assembly had chosen not to prohibit." Brief for Appellee Philadelphia at 43. Appellees finally note that Appellant Dougherty fails to identify any way in which the Ordinance conflicts with or impedes any state interest identifiable in the Election Code. The intentions manifest on the faces of the Election Code and the Ordinance, Philadelphia asserts, can be served simultaneously without either suffering any material limitation.

Appellees consider and reject Appellant Dougherty's reliance on this Court's decision in *Cali*, the only authority he presents in support of his conflict preemption argument. Appellees observe that, in *Cali*, this Court did not rely on silence in finding that a Philadelphia ordinance governing the timing special mayoral elections conflicted with state law, but rather on express provisions inconsistent with the timing of the special election Philadelphia sought to hold. While the Philadelphia ordinance in question in *Cali* directed that a special election for a mayoral vacancy occur at the next municipal or general election, the Election Code provided that "all" city offices were to be elected at a municipal election. Reading

14. Ultimately, Appellees find this strict standard irrelevant insofar as they argue that there is no conflict between any state statute and the Ordinance to begin with, and thus no cause to analyze the Ordinance under principles of conflict preemption.

"all" as "prima facie all-inclusive," we found Philadelphia's ordinance permitting the special mayoral election to occur in tandem with a general election patently irreconcilable with governing state law, and held that the ordinance was preempted. Thus, Appellees conclude, Dougherty's conflict preemption argument must fail.

With respect to Appellants Fattah's "field preemption" argument, Appellees contend that our caselaw is absolutely clear that we will only find the requisite tacit preemptive intent where that implication is essentially incontrovertible in the structure or subject matter of the state enactment in question.[15] Appellees argue that our caselaw does not justify finding field preemption simply because the Commonwealth has legislated in a given field, but only in cases where the legislation is so comprehensive that no other intent can be discerned. *See Council of Middletown*, 523 A.2d at 314 ("The state is not presumed to have preempted a field merely by legislating in it. The General Assembly must clearly show its intent to preempt a field in which it has legislated."); *cf. Weber*, 147 A.2d at 327 (identifying field preemption as occurring when "a course of [state] regulation and control ... brooks no municipal intervention"). Indeed, Appellees contend that we should reject the notion that our prior observations about "comprehensive regulation" even apply, given what they characterize as the legislature's "sparse regulation" with respect to campaign contributions. Thus, Appellees argue, the burden is on the party arguing for preemption to demonstrate that the General Assembly intended to preempt local law-making in the area in question, a burden Appellants cannot carry in this case.

Appellees also counter the notion that preemption should only be denied where the General Assembly has explicitly delegated some measure of authority to local bodies. Appellees acknowledge that, while our decisions in *Mars EMS* and *Weber* declining to find preemption both hinged on such delegations of authority, that is in no way required by law.

**15.** Appellees Philadelphia and Nutter file separate briefs but collectively raise the same issues in response to Appellants' challenges. Accordingly, we refer to their arguments collectively.

Rather, those manifestations of legislative intent simply provided the straightest path to the resolution in those cases.

Even to the extent such delegations are necessary, however, Appellees argue that the Public Official and Employee Ethics Act, *see* Act of Oct. 4, 1978, P.L. 883, No. 170, § 2, *as amended,* 65 Pa.C.S. §§ 1101, *et seq.* (Ethics Act), which was enacted on the same day as the 1978 revisions to the Election Code, provides precisely such an express delegation. Appellees observe that the Ethics Act, too, contains a modest campaign contribution provision, *see* 65 Pa.C.S. § 1103,[16] and thus should be read *in pari materia* with the Election Code. *See* 1 Pa.C.S. § 1932.[17] Appellees observe that the Ethics Act, which features one provision addressed to campaign finance, specifically invites local supplementation as did the relevant statutes in *Mars EMS* and *Weber. See* 65 Pa.C.S. § 1111 ("Any governmental body may adopt requirements to supplement this chapter, provided that no such requirements shall in any way be less restrictive than the chapter."). Thus, Appellees conclude that the Ethics Act evinces the General Assembly's clear intent to "prohibit [ ] campaign contributions intended to influence official action, and . . . authorize [ ] local legislation designed to 'supplement' this prohibition." Brief for Appellee Philadelphia at 28,[18] which should be imputed to

**16.** Section 1103 provides, *inter alia,* that

No person shall offer or give to a public official, public employee or nominee or candidate for public office or a member of his immediate family or a business with which he is associated, anything of monetary value, including a gift, loan, political contribution, reward or promise of future employment based on the offeror's or donor's understanding that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.

65 Pa.C.S. § 1103(b).

**17.** § 1932. **Statutes in pari materia**

(a) Statutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things.

(b) Statutes in pari materia shall be construed together, if possible, as one statute.

**18.** Appellees also observe that 65 Pa.C.S. § 1112 asserts the Ethics Act's preeminence over contrary legislation, providing that, "if the

the Election Code because it is *in pari materia* with the Ethics Act.[19] *Cf. Commonwealth, State Ethics Comm'n v. Cresson*, 528 Pa. 339, 597 A.2d 1146, 1149 (1991)(finding the Election Code and Ethics Act *in pari materia* with respect to the requirements for filing nomination provisions). Thus, Appellees maintain that the General Assembly has not manifested the requisite intent to support field preemption, and arguably has manifested a contrary intent in its invitation, in the Ethics Act, to local supplementation of related provisions.

■ We begin our analysis by reviewing the source of authority by which Philadelphia claims the prerogative to establish local campaign contribution limits. In *Schweiker*, this Court held that, "[u]nder the concept of home rule, . . . the locality in question may legislate concerning municipal governance without express statutory warrant for each new ordinance; rather, its ability to exercise municipal functions is

provisions of this chapter conflict with any other statute, ordinance, regulation or rule, the provisions of this chapter shall control."

19. In his Reply Brief, Appellant Fattah rejects Appellees' reliance on the Ethics Act. Fattah argues that 65 Pa.C.S. §§ 1103(b)-(c) aim to "prevent [] individuals from giving or receiving anything of monetary value with the *expectation* that the gift will somehow influence the public official. Under the Ethics Act, the size of a gift is relevant only in determining whether the gift must be publicly reported." Reply Brief for Fattah at 2. Thus, Fattah maintains, the Ethics Act's local supplementation provision, 65 Pa.C.S. § 1111, contemplates only supplementary ordinances that directly serve to assure the public that influence is not for sale, which take the form of more stringent disclosure requirements, not contribution limits. As with the rest of Fattah's arguments, however, this essentially hinges on the proposition that the General Assembly's failure to enact statewide contribution limits necessarily betrayed its intention that no such limits may be applied by any government body in Pennsylvania.

This line of argument significantly undermines Appellant Fattah's view (and, for that matter, Judge Colins' view, expressed in dissent in the Commonwealth Court, *see Nutter*, 921 A.2d at 68 (Colins, J., dissenting)) that permitting municipalities to enact local campaign contribution limits will "balkanize" election law in violation of the legislature's asserted desire for uniformity. Clearly, the General Assembly had little concern for "balkanization" when it expressly invited local supplementation of the Ethics Act, notwithstanding that the effect would differ little, in the abstract, from permitting local campaign contribution limits. In either case, significant aspects of a candidate's campaign-related activities will be determined according to where he is running for office.

limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly." 858 A.2d at 84 (internal quotation marks, citations, and modifications omitted). This account, of course, is consistent with the constitutional provision governing home rule, *see* PA. CONST. ART. IX, § 2, *supra* nn. 4, 9; the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. § 2961 (providing that a home rule municipality "may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter"); and its explication in our caselaw. *See, e.g., County of Delaware v. Township of Middletown,* 511 Pa. 66, 511 A.2d 811, 813 (1986). Moreover, such grants of municipal power "shall be liberally construed in favor of the municipality." *Id.* Thus, "[i]n analyzing a home rule municipality's exercise of power, . . . we begin with the view that it is valid absent a limitation found in the Constitution, the acts of the General Assembly, or the charter itself, and we resolve ambiguities in favor of the municipality." *Id.* at 813.

Notwithstanding the legislatures and our concomitant care to protect the authority of home rule municipalities, fundamental principles of preemption also apply to the courts consideration of whether a given municipal exercise of power is in fact limited by an act of the General Assembly. Preemption takes three forms, as noted, *supra:* express, conflict, and field preemption. *See Mars EMS,* 740 A.2d at 195; *Weber,* 147 A.2d at 327; *W. Penna. Rest. Ass'n.,* 77 A.2d at 619–20. Appellants in this case do not suggest that the General Assembly expressly signaled its preemptive intent in the Election Code. Thus, we need consider only whether Philadelphia's Ordinance directly conflicts with, and thus is preempted by, the Election Code, or, in the alternative, whether the Election Code manifests the legislature's intention to occupy the field of elections so comprehensively as to exclude all local regulation.[20]

**20.** In reviewing this question of law, our standard of review is *de novo* and our scope of review is plenary. *Schwartz v. Rockey,* 932 A.2d 885, 891 (Pa.2007).

 Only Appellant Dougherty argues that conflict preemption applies here, but the only regard in which he suggests that it does so depends on his claim that the Election Code manifests an affirmative intent to preclude any sort of campaign contribution limits. Dougherty, however, effectively admits that any such intent must be inferred from the Code, since the Code contains nothing directly on point. To that extent, however, the argument essentially sounds in field preemption rather than conflict preemption. Accordingly, the discussion collapses into that single inquiry.[21]

 Appellant Fattah would have us find preemption not in direct conflict but rather in the putatively comprehensive scheme of state regulation of elections that inheres in the combination of Article VII of our constitution and the Election Code. Article VII, § 6, of the Pennsylvania Constitution provides, in relevant part:

All laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State, except that laws regulating and requiring the registration of electors may be enacted to apply to cities only: Provided, That such laws be uniform for the cities of the same class. . . .

Pa. Const. art. VII, § 6 (language pertaining to voting machines omitted). In the first instance, therefore, we must address whether campaign contribution limits are "laws regulating the holding of elections by the citizens," as there is no question that the registration of electors is not at issue in this case.

Appellant Fattah speaks to this question only by cursory reference to our citation of that provision in *Kuznik*, 902 A.2d at 490 (noting that Article VII, § 6, "speaks of uniformity with

21. Appellant Dougherty's resort to *Cali* does nothing to resist this conclusion. Notwithstanding Dougherty's attempt to read it otherwise, in *Cali* the legislature had not been silent on the relevant question. Rather, it had expressly limited the election of all municipal officers to municipal elections occurring in odd-numbered years. The proposed special mayoral election at issue did not satisfy these express, mandatory criteria; were consequently in conflict with state law; and therefore were preempted. *See* 177 A.2d at 831. Dougherty can offer no analogous provision of the Election Code.

respect to the laws that regulate elections"). *Kuznik*, however, considered those portions of Article VII that address voting machines, not the more general language pertaining to "laws regulating the holding of elections." Notably, in language just before that quoted, we referred to the relevant mandate as requiring a "unitary system of *voting* in Pennsylvania." *Id.* at 490 (emphasis added). Thus, the plain language of Article VII, § 6, reveals no self-evident conflict with the Ordinance, since the latter does not unequivocally affect "the holding of elections." Indeed, in *Cali* we held that Article VII, § 6, which then appeared in materially identical form as Article VIII, § 7, "in its entirety relates ... to matters of procedure, methods and machinery of voting and like matters with respect to electors and voting," *see* 177 A.2d at 829, a characterization that does not support Appellant Fattah's attempt to characterize the section in question so broadly as to preclude regulations designed to ensure the integrity of the lengthy campaigns preceding elections.

Thus, we move to consider the prospect of conflicts with the enactments of the General Assembly. That body, first in 1937 and by amendment thereafter, enacted the Election Code, and it is to the potentially preemptive effect of the Code that we turn next. As noted, Appellant Fattah contends that the Code itself clearly manifests, albeit by omission, the General Assembly's intent not to impose limits on campaign contributions, and that the field of campaign finance is, therefore, preempted by state law. His argument stresses that in 1978, when the General Assembly supposedly considered and partially incorporated various federal election provisions, it deliberately declined to adopt federal contribution limits that were then contained in the federal code not because it intended to leave such questions open to municipalities, but rather because it found those limits to be unnecessary, undesirable, or inappropriate in Pennsylvania.

The first problem with Fattah's argument involves his failure to cite any authority to support his claim that the 1978 amendments to Pennsylvania's Election Code were fashioned with a watchful eye on the corollary federal provisions. While

the federal and Pennsylvania definitions of expenditure and contribution are undeniably similar, *see supra* n. 12, they are not so identical as to compel the conclusion that Pennsylvania's definitions were adopted from federal law. We find it curious that neither Appellant Fattah, who forwards and argues extensively based upon the claim that the General Assembly expressly adopted the federal definitions at issue, nor the Commonwealth Court, which evidently accepted Fattah's claim at face value, furnishes an iota of authority to demonstrate that the definitions similarities are reflective of anything more than a coincidence of concern for campaign finance active around the nation in the 1970s. Nothing in the statute itself, or in the historical references to the amendments in question, indicates that the General Assembly imagined itself to be adopting federal law as its own, which is notable because the General Assembly is not shy about acknowledging debts to federal law, where such exist.[22] This seriously undermines Fattah's attempt to infer any sort of affirmative intent on the part of the General Assembly to reject aspects of the federal law in question to the extent that inference depends on the assertion that the General Assembly deliberately picked and chose from among corollary federal enactments. There is simply no evidence that we can discern that this accurately characterizes the legislatures endeavor in overhauling the Election Code in 1978.

The second problem with Fattah's argument is that, even if Fattah's conclusory claims regarding the relationship

22. *See, e.g.*, 7 P.S. § 703, Cmt.–1965 ("The result of making subsection (a) comparable to the Federal Reserve Act [12 U.S.C.A.] is to make several changes in the prior Code."); 26 Pa.C.S. § 103, Jt. St. Govt. Comm. Cmt.–1971 ("This term ['Farm Operation'] is taken verbatim from the Federal act, 42 U.S.C. 4601(8)."); *cf.* 13 Pa.C.S.A. §§ 7301, Uniform Comm. Code Cmt. 1 ("The provision as to misdating in subsection (1) conforms to the policy of the amendment to the Federal Bills of Lading Act ... 49 U.S.C. Section 102...."), 8504, Uniform Commercial Code Cmt. 1 ("The locution 'shall promptly obtain and shall thereafter maintain' is taken from the corresponding regulation under federal securities law, 17 C.F.R. § 240.15c3-3."); 23 Pa.C.S. § 7205, Uniform Law Cmts., 2001 Main Vol. ("Drawing on the precedent of the federal Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A....").

between the 1978 amendments to our Election Code and the federal election code prevailing at that time have merit, so does the counter-interpretation ventured by Appellees—that the General Assembly's silence as to campaign contribution limits did not manifest its desire to prevent such limits from being applied, but rather its desire to leave the field open to locally tailored restrictions such as those contained in the Ordinance that are sensitive to peculiarities of the political landscape of a particular municipality. We cannot stress enough that a home rule municipality's exercise of its local authority is not lightly intruded upon, with ambiguities regarding such authority resolved in favor of the municipality. *County of Delaware*, 511 A.2d at 813. Moreover, we clearly have held that the mere fact of legislation in a field is insufficient, without more, to support a finding of preemptive legislative intent as to that field. *See Council of Middletown*, 523 A.2d at 314 ("The state is not presumed to have preempted a field merely by legislating in it. The General Assembly must clearly show its intent to preempt a field in which it has legislated.").

The caselaw Fattah offers in support of his argument for field preemption, moreover, fails to support his position. In *Mars EMS*, Adams Township and Callery Borough each designated Quality Emergency Medical Services, Inc. (Quality), as its primary provider of emergency medical services. The Pennsylvania Department of Health, responsible for assigning all licensed emergency medical service providers to "primary response areas," had designated Mars EMS and Quality to primary response areas encompassing both Adams and Callery. Following Adams' and Callery's designations, Mars EMS filed a complaint seeking injunctive relief on the basis that the EMS Act preempted Adams' and Callery's authority to designate Quality as their primary provider of emergency medical services.

On appeal of the Commonwealth Court's decision upholding the designation and rejecting Mars EMS's preemption argument, we first emphasized "that where the legislature has assumed to regulate a given course of conduct by prohibitory

enactments, a municipal corporation ... may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality...." *Mars EMS*, 740 A.2d at 195 (quoting *Natural Milk Producers Ass'n v. City and County of San Francisco*, 20 Cal.2d 101, 124 P.2d 25, 29 (1942)); *see Weber*, 147 A.2d at 327 ("[W]here the [state] Act is silent as to monopolistic domination [of an area of regulation] and a municipal ordinance provides for a localized procedure which furthers the salutary scope of the Act, the ordinance is welcomed as an ally, bringing reinforcements into the field of attainment of the statute's objectives."). We also reaffirmed the stringency of our preemption precedent by noting that, as of that writing, we had found preemption only in the areas of alcoholic beverages, anthracite strip mining, and banking. *Id.* With regard to alcoholic beverages and anthracite mining, we noted, the legislation in question expressly stated the legislature's intent that its enactments provide the exclusive source of regulatory law in these areas. *Id.* (citing 47 P.S. § 1–104 (alcoholic beverages); 52 P.S. § 681.20c (anthracite mining)). In the banking case, we found preemptive intent "because commercial necessity presents a special need for uniformity." *Id.* (citing *City of Pittsburgh v. Allegheny Valley Bank*, 488 Pa. 544, 412 A.2d 1366 (1980)). Thus, we reaffirmed that, "absent a clear statement of legislative intent to preempt, state legislation will not generally preempt local legislation on the same issue." *Mars EMS*, 740 A.2d at 196.[23] We noted that the EMS Act failed affirmatively to address whether local governments were authorized to enact supplementary legislation with regard to the delivery of emergency medical services. The EMS Act indicated that the Secretary of Health "shall, whenever feasible, involve local citizens in the decision-making process." *Id.* (quoting 35 P.S. § 6922(b)(3)). Accordingly, we concluded that the legislature had not manifested the

**23.** This language is misleading inasmuch as it implies that we found express preemption in *Allegheny Valley Bank*. That case, in fact, was a field preemption case. *See* 412 A.2d at 1369 ("Review of the Commonwealth's banking laws discloses the Legislature's intention to exclusively reserve regulation of the state banks to the Commonwealth.").

requisite preemptive intent to preclude local regulation in that same area.

Appellant Fattah's reliance on *Weber*, 394 Pa. 466, 147 A.2d 326, also is unavailing. *Weber* presented the question whether the state Beauty Culture Act precluded Philadelphia from passing additional licensure requirements for beauticians in its municipal Health Code. There as here, the act in question itself was silent as to local supplementation, and that omission, appellee argued, was tantamount to an affirmation of the General Assembly's preemptive intent. We rejected this argument, relying in part on the Commonwealth's parallel Barber Act. The two acts, we noted, had initially been passed in tandem in 1931, at which time neither statute addressed local supplementation. Soon after the Barber Act's passage, however, a trial court deemed it to have preemptive effect over local regulation in that field. The General Assembly, in 1935, responded by revising the Barber Act to specifically provide that "[n]othing contained in this act, or the act to which this an amendment, shall be construed as prohibiting any municipality from adopting appropriate ordinances, not inconsistent with ... this act...." 147 A.2d at 328. We found this language probative of the legislature's original intent, in passing the parallel 1931 acts, to leave the fields of barbering and cosmetology open to local supplementation.

While this ruling to some extent sounded in the peculiar legislative histories of the two parallel acts, this Court nonetheless spoke to the broader issues of preemption implicated in the case. Specifically, the Court noted that:

> The Legislature could not be expected to itemize the last towel and drop of antiseptic which, for sanitation and cleanliness, would be required in every barber and beauty shop in the State. The size of the municipality, congestion of population, geography of locale, weather and climate prevailing in the area could have a very decided bearing on the extent of the meticulousness of the sanitary supervision required in any particular group of shops. It would not be unnatural to assume that regulations could be stricter and more rigid in large cities where the turnover in clientele

would be comparatively rapid as against a village or small rural center where the customers are known by their first name, occupation and frequency of visit.

*Id.* at 329. Furthermore, we quoted our *Western Pennsylvania Restaurant Association* decision to the effect that "[a] municipal corporation ... may make such additional regulations in aid and furtherance of the purposes of the general law." *Id.* at 330 (quoting *W. Penna. Rest. Ass'n,* 77 A.2d at 620).[24]

Appellant Fattah's reliance on these cases distils to the idea that, because in each we faced and relied upon some affirmative legislative indication in finding no preemptive intent, the absence of such an indication necessarily requires us to find preemptive intent. As noted, however, this directly contradicts the language and the spirit of our preemption caselaw. Appellant Fattah makes no effort to reconcile his narrow reading with our oft-repeated language indicating that implied preemption is not so easily shown.

In his argument from the Election Code, Appellant Fattah observes that the Code provides for

administrative supervision of election procedures, location of polling places, creation of precincts, equipment and arrangement of polling places, the dates of elections and primaries and special elections, the nomination of candidates, the filing of nomination papers, the examination of nomination certificates and papers, objections to nomination petitions and papers, the qualification of electors, filling of vacancies in nominations, recount procedures, the preparation for and conduct of primaries and elections, the registration of voters and absentee registration, the use of paper ballots, the arrangement of names on the ballot, the duties of election judges and poll watchers, the closing time of polls, the

---

**24.** While reasonable minds may differ as to the degree to which contemporary electoral politics resemble a beauty pageant, it is difficult to dispute that some of the municipality-specific concerns cited in *Weber,* or others of that sort, may tend also to bear on the scale and effect of campaign contributions on local elections.

tabulation of votes, the resolution of contested elections and the use of absentee ballots.

Brief for Appellant Fattah at 9. Thus, he concludes that the Code aimed to comprehensively occupy the field of law pertaining to campaigns and elections.

Far from proving his point, however, this enumeration of statutorily controlled activities conversely suggests that when an Election Code so comprehensively deals with certain subjects yet fails materially to address itself to campaign contribution limits—especially where that omission is not identified as a function of legislative design to leave unfettered all such matters—it all but compels the inference that the legislature, in fact, intended not to foreclose local regulation of campaign contributions for local elections. Although the General Assembly may preempt such legislation, and has done so in enough other cases that its collective awareness of the value of so providing in explicit terms cannot be disputed, as of this writing it has not done so in the Election Code. Absent a clear legislative manifestation of such an intent, Appellants' preemption arguments must fail.

Accordingly, the Commonwealth Court's order, which upheld the validity of Philadelphia's campaign finance ordinance, is affirmed; the case remanded; and our jurisdiction relinquished.

Justices CASTILLE, SAYLOR and EAKIN and Justice BALDWIN join the opinion.

Chief Justice CAPPY files a dissenting opinion in which Justice FITZGERALD joins.

Chief Justice CAPPY dissenting.

I respectfully dissent. I have no quibble with the manner in which the majority sets forth the law regarding the preemption doctrine. Like Judge Colins opined in the decision below, however, I disagree with the majority's application of the law in the circumstances of this case. *See Nutter v. Dougherty,*

921 A.2d 44, 67 (Pa.Commw.2007) (Colins, J. concurring and dissenting).

The majority opinion rests much of its conclusion on the silence of the General Assembly with regard to campaign contributions. Nevertheless, I conclude that silence in this case speaks volumes. As Judge Colins pointed out, the Legislature has addressed the field of campaign contributions comprehensively in the Election Code, 25 P.S. §§ 3241–3260b. *See Nutter*, 921 A.2d at 67–68. By not addressing limits on campaign contributions in these same provisions, the Legislature reflected its intent *not* to provide for such limitations.

Furthermore, I share similar concerns to those raised by Judge Colins that the natural consequence of the majority's opinion today will be the "balkanization of the Election Code," since any locality will be free to adopt its own campaign financing regulations. *Id.* at 68. An inconsistent approach with regard to campaign finance limits among the various local entities would lead to confusion in the campaign rules, and, more importantly, completely undermine the uniformity the Election Code seeks to promote.

For these reasons, I must dissent.

Justice FITZGERALD joins this dissenting opinion.